## Salem

PIEDMONT MANUFACTURING COMPANY

AND

HARTFORD INSURANCE COMPANY

V.

LOIS P. EAST; COURTLAND MANUFACTURING
COMPANY; AETNA CASUALTY & SURETY
COMPANY; AMELIA DRESS COMPANY, INC.; AND
AMERICAN & FOREIGN INSURANCE COMPANY

No. 2605-92-3

Decided December 21, 1993

COUNSEL

Marianne N. Macon (Sands, Anderson, Marks & Miller, on brief), for appellants.

P. Scott De Bruin (Joseph R. Johnson, Jr. & Associates, on brief), for appellee, Lois P. East.

Martha White Medley (James A. L. Daniel; Daniel, Vaughan, Medley & Smitherman, on brief), for appellees, Courtland Manufacturing Company and Aetna Casualty & Surety Company.

John M. Oakey, Jr. (McGuire, Woods, Battle & Boothe, on brief), for appellees, Amelia Dress Company, Inc. and American & Foreign Insurance Company.

OPINION

**FITZPATRICK, J.**—Piedmont Manufacturing Company and Hartford Insurance Company (employer) contend that the commission erred in finding that: (1) Lois P. East's (claimant) condition and consequent disability is a compensable ordinary disease of life; (2) claimant received a communication of an occupational disease; (3) claimant's last injurious exposure was with this employer; (4) claimant's condition was totally disabling; and (5) a deposition of claimant taken in a prior claim was properly excluded. Finding no error, we affirm the commission's award of benefits.

Claimant suffers from de Quervain's disease, which manifests itself by severe pain in her left hand. Claimant worked for employer, a maker of tire valves, for twenty-four years. Her job as a "production machine operator" involved the repetitive use of her left hand to inspect and handle small components. Claimant sought benefits for an occupational disease, specifically, de Quervain's tenosynovitis. She worked for employer from December 5, 1966 until November 9, 1990, when she resigned because she was moving from the area. At the time of her resignation, she did not report to employer that she was experiencing pain in her hand.

After claimant resigned from her job with employer, she had two relatively short-term jobs as a sewing machine operator. First, she worked for Amelia Dress Company from November 12, 1990 until February 28, 1991. Thereafter, she worked for Courtland Manufacturing Company d/b/a "Brandy Ann" from April 15, 1991 until May 23, 1991. These jobs also required repetitive wrist movements. Prior to claimant's employment with Brandy Ann, her symptoms of severe hand and wrist pain increased in early April 1991, prompting her to seek treatment from Dr. Haney on May 6, 1991.

Throughout claimant's employment with Piedmont she experienced wrist pain and underwent three operations for carpal tunnel syndrome. After claimant's last carpal tunnel release in May 1979, she was released to return to work. The commission found that claimant continued to have pain in her left hand. She again sought treatment for the condition on June 8, 1989, with Dr. von Oesen and, at that time, had a "positive Finklestein test," which is indicative of de Quervain's disease.

On May 6, 1991, claimant sought treatment with Dr. Haney, another orthopedist. In an addendum to the May 6, 1991 office visit, Dr. Haney diagnosed claimant as having "DeQuervain's [tenosynovitis] of the left hand and wrist." Dr. Haney described this condition as "secondary to overuse syndrome or repetitive trauma syndrome, [and specifically attributed it to claimant's] previous employment [with Piedmont] where she had to use her hand repetitively over a long period of time." According to Dr. Haney, claimant's condition was so pronounced that she could "no longer perform the type of work she [had] been doing in the past" and was "disabled from any work" requiring "repetitive motion of her hand."

On June 24, 1991, Dr. von Oesen confirmed that claimant had "de Quervain's disease" affecting her left hand. Dr. von Oesen referred claimant to Dr. Dunstan as a possible surgical candidate. Dr. Dunstan, however, did not agree with the diagnosis of de Quervain's, and attributed claimant's symptoms to degenerative arthritis. Dr. Dunstan could not ascribe that condition solely to the claimant's exposure at "the work place."

The commission, in affirming the award of the deputy commissioner, found that claimant suffered from de Quervain's tenosynovitis, a disease. The commission considered claimant's condition an ordinary disease of life pursuant to Code § 65.2-401, and found that claimant's evidence was sufficient to meet the requirements of Code §§ 65.2-400 and 65.2-401.

The commission found that claimant suffered her last injurious exposure to the causative hazards of the disease while working at Piedmont. This finding was based on the additional finding that claimant's symptoms predated her employment with Amelia or Brandy Ann and that claimant's treating physician specifically identified claimant's work at Piedmont as the cause of her condition. The commission also found that claimant was totally disabled because no

medical evidence indicated that the claimant had any remaining capacity to work. Lastly, claimant's deposition was excluded by the commission because "two of the parties to the current claim, i.e., Amelia and Brandy Ann, were not parties to the earlier proceeding and, therefore, had no notice of the deposition."

## CLAIMANT'S CONDITION IS A "DISEASE"

■ As a threshold matter, employer argues that de Quervain's tenosynovitis is not a disease, but, rather, a repetitive trauma injury. As our Supreme Court recently explained in *Merillat Industries, Inc. v. Parks,* 246 Va. 429, 436 S.E.2d 600 (1993), the Act "requires that the condition for which compensation is sought as an occupational disease must first qualify as a disease." *Id.* at 432, 436 S.E.2d at 601. A disease is defined as:

> any deviation from or interruption of the normal structure or function of any part, organ, or system (or combination thereof) of the body that is manifested by a characteristic set of symptoms and signs and whose etiology, pathology, and prognosis may be known or unknown.

*Sloane-Dorland Ann. Medical-Legal Dictionary* 209 (1987).

Claimant's specific condition, de Quervain's disease, is defined as:

> [P]ainful tenosynovitis due to relative narrowness of the common tendon sheath of the abductor pollicis longus and the extensor pollicis brevis.

*Id.* at 212.

The medical evidence proves that on June 8, 1989, claimant was seen by Dr. von Oesen for "a swollen and painful left hand . . . [with] a significant area of tenderness." At that time, claimant had "*a positive Finklestein test,* normal neurologic otherwise." (emphasis added). The evidence is uncontroverted that a positive Finklestein test is indicative of de Quervain's disease. On June 24, 1991, Dr. von Oesen completed an "Attending Physician Report," wherein he diagnosed claimant's condition as "de Quervain's disease." On October 18, 1991, Dr. Haney, claimant's primary treating physician, opined that claimant's condition "is degenerative joint disease of the carpometacarpal joint."

We conclude from the medical evidence in the record that credible evidence supports the commission's finding "that the claimant's evidence establishes that she suffers from DeQuervain's tenosynovitis, a disease." This case is distinguishable from *Merillat,* a case involving a rotator cuff tear, because in that case there was no determination that the tear to claimant's rotator cuff was a disease. In addition, the Supreme Court noted that "all the testifying physicians except one described the rotator cuff tear as an injury. . . . [and] [b]ased on this record, the rotator cuff tear suffered by Parks must be classified as an injury, not a disease." *Merillat,* 246 Va. at 433, 436 S.E.2d at 602 (footnote omitted).

## COMPENSABLE ORDINARY DISEASE OF LIFE

The commission noted that some medical evidence in the record indicated that de Quervain's disease could be caused by any repetitive hand or wrist motion. Accordingly, the commission considered claimant's condition an ordinary disease of life within the meaning of Code § 65.2-401.[1] As such, claimant had the burden of producing clear and convincing evidence that her ordinary disease of life was employment related. Code § 65.2-401 provides that an ordinary disease of life, which is a disease that the general public is exposed to outside of employment:

> may be treated as an occupational disease . . . if it is established by clear and convincing evidence, to a reasonable medical certainty, that it arose out of and in the course of employment as provided in § 65.2-400 with respect to occupational diseases and did not result from causes outside of the employment, and that:
>
> . . . .
>
> 3. It is characteristic of the employment and was caused by conditions peculiar to such employment.

Under familiar principles, on appellate review, the court will construe the evidence in the light most favorable to the prevailing party below. *Crisp v. Brown's Tysons Corner Dodge, Inc.,* 1 Va. App. 503, 504, 339 S.E.2d 916, 916 (1986). Further, "'[w]hether a disease is causally related to the employment and not causally related to other factors is . . . a finding of fact.' When there is credible evidence to support it, such a finding of fact is 'conclusive and binding' on this

---

[1] We express no opinion as to whether claimant's condition should have been considered an occupational disease within the meaning of Code § 65.2-400.

Court." *Ross Labs. v. Barbour,* 13 Va. App. 373, 377-78, 412 S.E.2d 205, 208 (1991) (quoting *Island Creek Coal Co. v. Breeding,* 6 Va. App. 1, 12, 365 S.E.2d 782, 788 (1988)).

In the case at bar, Dr. Haney, claimant's treating physician, opined as follows:

> After review of [claimant's] work history it is my opinion to within a reasonable degree of medical probability that this diagnosis [tendinitis of the left hand] originates with her 24 year employment at Piedmont Manufacturing where she worked as a machinist sustaining repetitive trauma syndrome of the left hand and wrist.
>
> It has been documented in numerous publications that carpal tunnel syndrome and subsequent other wrist and hand syndromes are a result of repetitive motion such as that of a machinist. It is not uncommon for subsequent degenerative processes to surface years after the original occupation as I believe is the case with Ms. East.

We find that Dr. Haney's opinion provides the credible evidence necessary to support the commission's finding that claimant satisfied her burden of proof under Code § 65.2-401.

■ Employer relies heavily upon the deposition testimony of Dr. Dunstan, who did not believe that claimant suffered from de Quervain's. He diagnosed claimant's condition as trapezial metacarpal joint arthritis. It is well settled, however, that "[q]uestions raised by conflicting medical opinions must be decided by the commission." *Penley v. Island Creek Coal Co.,* 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989) (citations omitted). In accepting Dr. Haney's opinion, the commission noted that Dr. von Oeson, an orthopedic surgeon, agreed with Dr. Haney's diagnosis of de Quervain's tenosynovitis. Further, the record shows that Dr. Dunstan examined claimant on only one occasion for this condition and, at the time he was deposed, did not appear to be completely familiar with claimant's prior medical history.

For an ordinary disease of life to be treated as a compensable occupational disease, claimant's evidence must also satisfy the six requirements of Code § 65.2-400, which provides as follows:

A. As used in this title, unless the context clearly indicates otherwise, the term "occupational disease" means a disease arising out of and in the course of employment . . . .

B. A disease shall be deemed to arise out of the employment only if there is apparent to the rational mind, upon consideration of all the circumstances:

1. A direct causal connection between the conditions under which work is performed and the occupational disease;

2. It can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

3. It can be fairly traced to the employment as the proximate cause;

4. It is neither a disease to which an employee may have had substantial exposure outside of the employment, nor any condition of the neck, back or spinal column;

5. It is incidental to the character of the business and not independent of the relation of employer and employee; and

6. It had its origin in a risk connected with the employment and flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

The evidence proved that claimant's treating physician unequivocally opined that claimant's condition "originat[ed] with her 24 year employment at Piedmont Manufacturing." In addition, claimant described the extent of her duties with employer and the repetitive hand movements that were required to perform her job.

█ Credible evidence supports the commission's finding that there was no substantial exposure to the causes of claimant's condition outside of her employment. While there is some evidence in the record that several years ago claimant engaged in cake decorating as a hobby, there is no evidence to suggest that this activity was a *substantial* or even partial cause of her present condition. Claimant is not required to "prove that the occupational activity caused her tendinitis to the complete exclusion of any other contributing outside factor. 'Reasonable degree of medical certainty' requires only that 'it is at least *more probable than not* that the disease arose out of and in the course of

employment.'" *The Greif Cos. v. Sipe,* 16 Va. App. 709, 715, 434 S.E.2d 314, 318 (1993) (quoting *Barbour,* 13 Va. App. at 377, 412 S.E.2d at 208). Accordingly, we conclude that the commission's finding that claimant's evidence satisfied the requirements of both Code §§ 65.2-400 and 65.2-401 is supported by credible evidence in the record.

## COMMUNICATION TO CLAIMANT OF DIAGNOSIS OF AN OCCUPATIONAL DISEASE

■ "Under our Workers' Compensation Act, an occupational disease is not compensable until a diagnosis of such has been communicated to the employee. The date of the first communication of the diagnosis is treated as 'the happening of an injury by accident.'" *Breeding,* 6 Va. App. at 9-10, 365 S.E.2d at 787 (quoting former Code § 65.1-49).[2] "The diagnosis need not contain precise medical terminology as long as the diagnosis is definite and informs the claimant in clear and understandable language that he or she is suffering from a disease that arises out of and in the course of employment." *Via v. Citicorp Mortgage, Inc.,* 10 Va. App. 572, 576, 394 S.E.2d 505, 507 (1990) (citation omitted). Employer argues that claimant is not entitled to benefits because she failed to prove that she "received a communication of a diagnosis of [an occupational disease] . . . caused by her work at Piedmont Manufacturing Company." We disagree.

At the hearing before the deputy commissioner, the claimant testified as follows:

Q. When or were you ever told that your condition was caused by your employment?

A. In May the 6th when I went to Dr. Haney's office. The first time that I ever saw Dr. Haney, he didn't ask me where I worked or what I was doing. What he said was you have ruined your hands.

. . . .

Q. Did he tell you what you had on May 6th and did he relate it to you at that time?

A. Yes, he told me that I had carpal tunnel—whatever it is he called it carpal something. He said that the bones in my hand had

---

[2] Former Code § 65.1-49 was recodified as Code § 65.2-403.

deteriorated and it was due to the fact that I had done the same thing year after year and day after day and used my hand in a repetitive motions and that was before he asked me what it was I was doing.

Q. Did you then tell him where you worked?

. . . .

A. I told him that I had worked at Piedmont Manufacturing for twenty-four years and that I had worked at Amelia Dress Company but I had been laid off. And he didn't want —

*MR. OAKEY:*
I would object to what he says.

*DEPUTY COMMISSIONER COSTA:*
Sustained.

Q. Well, what did you tell him?

A. Well, I was told not to go back to work.

Claimant's testimony was corroborated by Dr. Haney's office notes of May 6, 1991, which indicate:

[Claimant] is being seen for [tendinitis] of the left hand which began several years ago but became somewhat severe about two weeks ago.

. . . .

Diagnosis is [de Quervain's tenosynovitis] of the left hand and wrist secondary to overuse syndrome or repetitive trauma syndrome which has been chronic through the years from her previous employment where she had to use her hand repetitively over a long period of time. . . . The multiple cumulative trauma syndrome is effecting [sic] both of her hands and progressed to the point that she can no longer perform the type of work that she has been doing in the past and she is indeed disabled from any work now that would require repetitive motion of her hand.

We find that this uncontradicted evidence supports the commission's finding that claimant received communication of a diagnosis of an occupational disease on May 6, 1991.

## LAST INJURIOUS EXPOSURE

Employer contends that the commission erred in finding that claimant received her last injurious exposure at Piedmont. Code § 65.2-404 provides:

A. When an employee has an occupational disease that is covered by this title, the employer in whose employment he was last injuriously exposed to the hazards of the disease and the employer's insurance carrier, if any, at the time of the exposure, shall alone be liable therefor, without right to contribution from any prior employer or insurance carrier.

B. For the purposes of this section, "injurious exposure" means an exposure to the causative hazard of such disease which is *reasonably calculated* to bring on the disease in question.

(Emphasis added).

Employer argues that all of claimant's jobs have involved repetitive hand motion, and that it was not until claimant's employment at Brandy Ann that she allegedly could no longer work as a result of her condition. As such, employer contends that Brandy Ann was "the employer in whose employment [claimant] was last injuriously exposed to the hazards of the disease" within the meaning of Code § 65.2-404(A).

"Injurious exposure" to an occupational disease, as the term is used in Code [65.2-404], means "an exposure to the causative hazard of such disease which is reasonably calculated to bring on the disease in question." A claimant can meet the statutory standard either "*by establishing actual causation* or aggravation of the disease or by showing that the exposure was of such duration and intensity that it generally causes the disease in question, even though actual causation or aggravation cannot be established in the claimant's case."

*Fairfax County v. Espinola,* 11 Va. App. 126, 131, 396 S.E.2d 856, 860 (1990) (emphasis added) (citations omitted); *see also Caudle-Hyatt, Inc. v. Mixon,* 220 Va. 495, 260 S.E.2d 193 (1979).

■ It is well settled that liability under the Act "attaches to the employer in whose employment a claimant was last injuriously exposed to the hazards of an occupational disease prior to 'first communication of the diagnosis.'" *Cooper v. Mary E. Coal Corp.,* 215 Va. 806,

809, 214 S.E.2d 162, 165 (1975). In this case, the record establishes that claimant received her first communication of an occupational disease on May 6, 1991. If statutory liability was simply imposed upon the last employer prior to a diagnosis of an occupational disease, Brandy Ann would be responsible for any award of benefits in this case. This is not the rule in Virginia. The last injurious exposure rule requires not only the establishment of the date of the first communication of the diagnosis, but also a factual determination that claimant suffered "an exposure to the causative hazard of such disease which is reasonably calculated to bring on the disease in question." Code § 65.2-404(B). In this case, the evidence proved that claimant's condition had become apparent *prior to* her employment with Brandy Ann. Further, the diagnosis of an occupational disease was based in large part on X rays taken before her employment with Brandy Ann. The only reason she received communication of the diagnosis after her employment began at Brandy Ann was due to her physician's appointment schedule.

The commission properly considered the level of repetitive hand motion required of claimant to perform her jobs, the amount of claimant's exposure and the duration of her employment with each employer. *See Mixon,* 220 Va. at 500, 260 S.E.2d at 196 ("Although the statutory definition [of injurious exposure] is broader than [the common law] definition . . . it nevertheless does not extend an employer's liability to exposures not 'reasonably calculated to bring on the disease in question'"); *see also Todd Pac. Shipyards Corp. v. Director,* 914 F.2d 1317 (9th Cir. 1990) ("minimal exposure" may not support a determination of last injurious exposure); *Stoots v. Great Barrier Insulation Co.,* 71 O.W.C. 179, 183 (1992) ("injurious exposure" requires a factual basis as to how much exposure occurred). In addition, the commission considered the conflicting medical evidence, which included the treating physician's opinion that claimant's condition was caused by her twenty four years of employment with Piedmont. From this evidence, the commission found that claimant proved *actual* causation and that her last "injurious exposure" was with employer. Ample credible evidence in the record supports this finding. Accordingly, the commission's finding of fact is binding on appeal. *Blue Diamond Coal Co. v. Pannell,* 203 Va. 49, 53, 122 S.E.2d 666, 670 (1961).

## TOTAL DISABILITY

Employer contends that no credible evidence supports the commission's finding that claimant is totally disabled. We disagree. Claimant testified about her condition and its continuing impact on her ability to work. In addition, claimant's education, vocational history and medical evidence corroborate her assertion of total disability. On June 10, 1991, Dr. Haney certified claimant's total disability and noted that the "[l]ength of probable future disability [was] undetermined." On July 8, 1991 and on January 24, 1992, Dr. Haney again certified claimant's condition to be totally disabled and noted that probable future total disability was "six months or more." This evidence is uncontradicted. Accordingly, we find employer's appeal of this issue without merit. Because we affirm the commission's finding of total disability, we do not reach employer's argument that claimant failed adequately to market her remaining capacity.

## EXCLUSION OF DEPOSITION

Lastly, employer argues that the deputy commissioner abused his discretion by failing to allow for impeachment purposes the use of a discovery deposition from an earlier claim. At the beginning of the hearing, Deputy Commissioner Costa stated that he would consider all the medical reports, "but I will not consider the deposition, I believe it was taken earlier when some of the parties were not involved." No objection was made to this ruling. Thereafter, during cross-examination of the claimant by employer's counsel, the following exchange transpired:

Q. Okay. Now, do you remember when you gave a deposition in this case back in November of 1991?

A. I think it was when I gave at Scott's office. I gave one to someone in Scott's office. I don't remember exactly what the date was, but I did give one to someone in Scott's office.

A. And this was last year?

*DEPUTY COMMISSIONER COSTA:*
Go ahead, Mr. Daniel.

*MR. DANIEL:*
On behalf of my employer, we would object to the use of the deposition. I thought you had already said it was not going to be used. All parties were not present.

*MR. OAKEY:*
I would also (Inaudible).

*DEPUTY COMMISSIONER COSTA:*
I did for obvious reasons. It would be inappropriate to use deposition transcript when not all the present parties participated. So, that is what I indicated at the outset and it's still my position.

*MS. MACON:*
And you will not allow it to be used even for impeachment purposes?

*DEPUTY COMMISSIONER COSTA:*
No, no, not for any purpose.

*MS. MACON:*
If you could please note my objection for the record.

Employer's counsel made no proffer of the relevant portions of the deposition that she wanted to use for impeachment either to the deputy commissioner or in the application for review to the full commission. Likewise, she did not explain why such testimony was relevant and material.

■ "When cross-examination is limited by the court and [a party] challenges the court's ruling on appeal, he or she must make a proper proffer of the excluded testimony." *Stewart v. Commonwealth,* 10 Va. App. 563, 568, 394 S.E.2d 509, 512 (1990) (citations omitted). Further, "[a]n appellant must demonstrate that the excluded evidence is relevant and material and that the party was entitled to have it introduced in order to establish on appeal that the trial court erred in excluding it." *Toro v. City of Norfolk,* 14 Va. App. 244, 254, 416 S.E.2d 29, 35 (1992) (citation omitted). From the record before us, we have no way of knowing what point employer's counsel was going to make or what relevance claimant's deposition from an earlier claim had on the claim at bar.

Notwithstanding the lack of an evidentiary proffer, the Act contemplates broad discretion in the commission regarding the admissibility of evidence. Code § 65.2-704 directs that the commission "shall hear the parties at issue, their representatives, and witnesses; [and] shall decide the issues in a summary manner." Further Rule 1 of the Rules of the Virginia Workers' Compensation Commission provides in part:

The Commission is not bound by statutory or common law rules of pleading or evidence, nor by technical rules of practice, but will conduct such hearings and make such investigations into the questions at issue in such manner as in its judgment are held adapted to ascertain and determine expeditiously and accurately the substantial rights of the parties and to carry out the spirit of the Workers' Compensation Act; and to that end, hearsay evidence may be received.

From the record before us, we cannot say that the deputy commissioner abused his discretion in refusing to allow the deposition from an earlier claim to be used at the hearing below.

For the reasons set forth above, we affirm the decision of the commission.

*Affirmed.*

Koontz, J., and Elder, J., concurred.