465 S.E.2d 156

**ROCCO TURKEYS, INC.**

**and**

**Home Indemnity Company**

v.

**Olga LEMUS.**

**Record No. 2276–94–3.**

Court of Appeals of Virginia.

Jan. 3, 1996.

504

Cathleen P. Welsh; Wharton, Aldhizer & Weaver, P.L.C., on brief, Harrisonburg, for appellants. Appellants submitting on brief.

A. Thomas Lane, Jr., on brief, Arlington, for appellee. Appellee submitting on brief.

Present: BAKER, COLEMAN and OVERTON, JJ.

COLEMAN, Judge.

In this workers' compensation case, Olga Lemus, an employee of Rocco Turkeys, Inc. (Rocco), filed an application for benefits claiming that her carpal tunnel syndrome (CTS) and right ring trigger finger conditions constitute occupational diseases. The commission found that her CTS was a compensable occupational disease. However, because she had lost no time from work due to her CTS, the commission only awarded her medical benefits. Rocco appeals the commission's decision.

Rocco contends that when CTS results from repetitive motion or cumulative trauma, it is not a disease as contemplated in the Workers' Compensation Act (Act) and that the commission's decision conflicts with the Supreme Court's holding in *Merillat Industries, Inc. v. Parks*, 246 Va. 429, 433–34, 436 S.E.2d 600, 601–02 (1993). Rocco asserts that under

*Merillat,* an ailment or condition resulting from the cumulative effects of repetitive motion or overuse, such as CTS, is a gradually incurred injury and cannot qualify as a disease.

 We hold, however, that CTS may qualify as a disease, depending upon its pathology or how it develops. *See Perdue Farms, Inc. v. McCutchan,* 21 Va.App. 65, 461 S.E.2d 431 (1995). CTS, which is a condition that exhibits a characteristic set of symptoms caused by compression of the median nerve in the carpal tunnel, will qualify as a disease when it develops as the body's response to environmental factors, infective agents, or inherent defects of the body. CTS may be caused by a number of precipitating factors or events, such as repetitive motion, cumulative trauma, obesity, rubella, pregnancy, rheumatoid arthritis, gout, and hypothyroidism, or a traumatic injury. 2 *Cecil Textbook of Medicine* 1563 (19th ed.1992). Thus, a claimant's CTS may be a disease depending on how it develops. The Supreme Court's decision in *Merillat* does not preclude this holding. Accordingly, because the evidence supports the commission's finding that the claimant's CTS developed as a condition or impairment in response to repetitive overuse and cumulative trauma, its pathology and ideology are consistent with the definition of disease; therefore, we affirm the commission's finding that claimant's CTS was a compensable occupational disease.

## FACTS

The claimant started working for Rocco in the spring of 1993. Her responsibilities included skinning turkey wings, which required her to make repetitive up and down motions with her right hand. After two or three weeks at Rocco, the claimant experienced problems with her right hand. Dr. Richard W. Lord, Jr. examined the claimant on May 22, 1993, and diagnosed her as having tendinitis of the hand secondary to overuse. He noted that the claimant exhibited no symptoms of CTS at the time.

Rocco laid off the claimant on June 23, 1993. Dr. Lord examined her again on August 4, 1993, and noted that a joint

on one of her fingers appeared to be slipping out of place. He referred the claimant to Dr. G. Edward Chappell, Jr., an orthopedist, who examined her on August 23, 1993. Dr. Chappell stated that he believed the claimant suffered from "carpal tunnel syndrome and triggering of the right ring finger," and he arranged for further testing. Nerve conduction studies "showed probable mild right carpal tunnel syndrome on electrical grounds."

Dr. Chappell reported that, in his opinion, the repetitive nature of the claimant's job at Rocco caused her CTS and trigger finger condition. When asked whether the condition would, in medical terminology, be considered a disease related to the claimant's occupation, Dr. Chappell stated, "It can be a disease of ordinary life. It can be caused by the occupation she stated she did." Dr. Chappell, in response to questions from the employer's counsel, stated that the claimant's condition was likely a result of cumulative trauma. Dr. Chappell did not place the claimant under work restrictions. Dr. Chappell later reported that the condition "could be a disease of ordinary life, but most likely cumulative trauma."

## ANALYSIS

Code § 65.2–400(A) provides that "the term 'occupational disease' means a disease arising out of and in the course of employment." In *Merillat*, the Supreme Court reiterated that the Workers' Compensation Act "requires that the condition for which compensation is sought as an occupational disease must first qualify as a disease." 246 Va. at 432, 436 S.E.2d at 601. In response to *Merillat*, this Court defined "disease" as " 'any deviation from or interruption of the normal structure or function of any part, organ, or system (or combination thereof) of the body that is manifested by a characteristic set of symptoms and signs and whose etiology, pathology, and prognosis may be known or unknown.' " *Piedmont Mfg. Co. v. East,* 17 Va.App. 499, 503, 438 S.E.2d 769, 772 (1993) (quoting *Sloane–Dorland Ann. Medical–Legal Dictionary* 209 (1987)). Subsequently, we noted in *Commonwealth/Department of State Police v. Haga,* 18 Va.App. 162, 166, 442 S.E.2d

424, 426 (1994), that the commission had previously employed a similar and consistent definition of disease to that which we recognized in *Piedmont.*

■ In *Haga,* the commission employed the definition:

Disease is an impairment of the normal state of the living body or any of its components that interrupts or modifies the vital functions, being a response to environmental factors (as malnutrition, industrial hazards or climate), to specific infective agents as worms, bacteria or viruses), to inherent defects of the organisms (as various genetic anomalies), or to combinations of these factors.

18 Va.App. at 164, 442 S.E.2d at 425 (quoting *Fletcher v. TAD Technical Servs. Corp.,* VWC 150–41–13 (March 12, 1992)). "The construction afforded a statute by the public officials charged with its administration and enforcement is entitled to be given great weight by a court." *Haga,* 18 Va.App. at 165, 442 S.E.2d at 425.

Applying the *Piedmont* definition, we subsequently held that CTS qualified as a disease in two cases where CTS had afflicted separate employees. In one case the employee's bilateral CTS was caused by "sustained motion" on the assembly line packing chicken nuggets for several weeks. In the other case, the employee's CTS was caused by repetitive motion and overuse in having to flex her hands and wrists for approximately eight months on an automotive assembly line. *Perdue Farms,* 21 Va.App. at 69, 461 S.E.2d at 433.

Rocco contends that the proper definition of the term "disease" as embodied in the Act is more narrow than the definition we used in *Piedmont* and applied in *Perdue,* and that by adopting such a broad definition, we disregarded the Supreme Court's directive in *Merillat* that "[a] definition of either 'injury' or 'disease' [should not be] so broad as to encompass any bodily ailment of whatever origin ... because it would make unnecessary and meaningless the two categories." *Merillat,* 246 Va. at 433, 436 S.E.2d at 602 (quoting *Holly Farms v. Yancey,* 228 Va. 337, 340–41, 321 S.E.2d 298,

300 (1984)); *see also Perdue Farms,* 21 Va.App. at 74, 461 S.E.2d at 437 (Koontz, J., dissenting).

We believe the definition of "disease" in *Piedmont* is consistent with the conventional understanding of that term and preserves the distinction between "injury" and "disease" that the Act steadfastly maintains. Moreover, the principle of *stare decisis* requires adherence to the definition of disease set forth in *Piedmont* and as applied by this Court to CTS in *Perdue Farms.* *See Commonwealth v. Burns,* 240 Va. 171, 174, 395 S.E.2d 456, 457 (1990). Nevertheless, were we required to apply a narrower definition of the term "disease," or one similar to that proposed in the *Perdue* dissent,[1] the claimant's CTS would still qualify as a disease.

We do not read *Merillat* to hold that, under the Act, all conditions that are gradually incurred from repetitive motion or cumulative trauma are injuries, rather than diseases. In fact, many of the conditions that are unquestionably classified as diseases under the Act are gradually incurred conditions that result from cumulative effects of exposure to various causative factors, including such diseases as asbestosis, pneumoconiosis, byssinoses, and histoplasmosis. Similarly, when the cumulative effects of exposure to repetitive motion or cumulative trauma cause the body to react in such a way that a condition develops with a commonly recognized set of symptoms that is, according to conventional understanding, consid-

---

1. Judge Koontz, in construing *Merillat,* expressed the view, in dissent, that disease "does not include conditions of cumulative trauma resulting from repetitive motion" and that disease "should include all diseases caused by infectious biological agents where the illness is contracted as a result of exposure uncommon to ordinary life," and "should include specifically enumerated conditions resulting from occupational exposure to poisons, chemicals, fumes, dusts, spores, radiation and other environmental hazards." *Perdue Farms,* 21 Va.App. at 77, 461 S.E.2d at 437.

We do not understand Judge Koontz to have suggested an all inclusive definition of what is a disease, but rather to have recognized a nonexclusive set of factors or agents that are common in the workplace and commonly known to cause conditions that are generally recognized as diseases, from which list he would expressly exclude "exposure" to cumulative trauma and repetitive motion.

ered a disease, then the condition is a disease as defined by the Act.

We agree that whether a particular condition qualifies as a disease under the Act does not solely "turn on whether a particular treating physician labels a condition as a 'disease' or an 'injury.'" *Perdue Farms,* 21 Va.App. at 76, 461 S.E.2d at 437 (Koontz, J., dissenting). Nevertheless, a medical diagnosis of "disease" is a fact that the commission may consider in determining whether a condition is a disease. Ultimately, however, whether a condition is a disease under the Act depends upon how the condition develops pathologically and what causes the condition to develop. The commission may determine the pathology of the condition or its causes either from the evidence before it or by its reference to accepted medical authority. Thus, in determining whether a claimant's CTS qualifies as a disease, the commission must consider whether, based upon the evidence before it or its reliance upon recognized medical authority, the claimant's condition is one that has developed as a disease within the foregoing definition.

Even were we to accept the employer's argument that our definition of disease is overly broad, nevertheless, claimant's CTS would qualify as a disease under a more narrow and stringent definition. "When the proper construction of a law is not clear from the words of a statute," we look to the legislative history to discern the statutory intent. *Ambrogi v. Koontz,* 224 Va. 381, 386–87, 297 S.E.2d 660, 663 (1982). Although the Act does not expressly define disease or state whether CTS is a disease under either Code §§ 65.2–400 or –401, the legislative history of the occupational disease statutes demonstrates that the legislature in 1970 intended to expand the definition of disease to include such tendon-sheath disorders as tenosynovitis, which includes CTS.

The predecessor to Code § 65.2–400 provided a schedule of occupational diseases, and a condition was not compensable as a disease under the Act unless it was listed in this schedule. *See* Code § 65.1–47 (repealed 1970). In 1969, a General

Assembly study committee recommended eliminating the schedule of diseases. Report of the Virginia Advisory Legislative Council, *Matters Pertinent to the Industrial Commission of Virginia and Workmen's Compensation Laws of Virginia,* Va.H.Doc. No. 17, at 6 (1969). The committee's recommendation was based on its finding that the schedule of conditions considered to be diseases was too restrictive.

The schedule of occupational diseases as set out in § 65.1–47 attempts to be all-inclusive. However, the only possible effect the schedule can have is to eliminate a disease which may in fact be an occupational disease.... *The elimination of the schedule insures the most comprehensive coverage of occupational diseases;* yet the employer is not prejudiced because the disease must in fact be an occupational disease, arising out of and in the course of employment.

*Id.* (emphasis added). The General Assembly accepted this recommendation and repealed the schedule of occupational diseases, leaving in its place the current statutory scheme. 1970 Va.Acts. 470.

▆▆▆ Beginning in 1958 and continuing until the legislature eliminated the schedule of occupational diseases in 1970, the schedule included tenosynovitis.[2] *See* 1958 Va.Acts 457. Tenosynovitis, like CTS, is a type of tendon-sheath disorder and is "usually caused by the constant repetition of stereotype movements." David F. Tver & Kenneth A. Anderson, *Industrial Medicine Desk Reference* 282 (1986); *see also Lamberson v. Phillips Oldsmobile, Inc.,* 63 O.I.C. 212, 214 (1984) (noting that CTS is "known as tendinitis or tenosynovitis in the area of the median nerve and the carpal tunnel"). Thus, the schedule of diseases, which was the precursor to the current statutory scheme, was not limited to "diseases caused by

---

2. The General Assembly first enacted an occupational disease schedule in 1944, and this schedule did not include tenosynovitis. 1944 Va.Acts. 77. In 1952, the legislature repealed the occupational disease schedule. 1952 Va.Acts 565. Six years later, the legislature reenacted the schedule and included tenosynovitis as an occupational disease. 1958 Va. Acts 457.

infectious biological agents" or conditions caused by exposure only to chemical or biological environmental hazards, *see Perdue Farms*, 21 Va.App. at 77, 461 S.E.2d at 437 (Koontz, J., dissenting). The schedule that the legislature discarded as being too restrictive included a cumulative trauma condition resulting from repetitive motion. We, therefore, cannot conclude that the legislature intended Code §§ 65.2–400 and –401 to depart in such a significant manner from their statutory predecessors as to limit or exempt CTS from coverage under the Act. When the General Assembly eliminated the schedule of diseases in order to expand, rather than restrict, the coverage of the Act, it clearly expressed its intention. Accordingly, we conclude that in enacting the current statutory scheme, the legislature intended that CTS, when it develops gradually as the body's response to overuse or cumulative motion, be treated as a disease.

The case law of this Court and the Supreme Court is consistent with this conclusion. This Court has expressly found that CTS, de Quervain's disease, and tendinitis, all types of tendon-sheath disorders related to tenosynovitis, may be diseases under Code § 65.2–400. *Perdue Farms*, 21 Va.App. at 69, 461 S.E.2d at 433 (CTS); *Piedmont*, 17 Va.App. at 504, 438 S.E.2d at 772 (de Quervain's); *The Greif Companies v. Sipe*, 16 Va.App. 709, 714, 434 S.E.2d 314, 317 (1993) (tendinitis). Moreover, the Supreme Court has acknowledged the commission's finding that tenosynovitis may be a disease. *See Western Elec. Co. v. Gilliam*, 229 Va. 245, 247, 329 S.E.2d 13, 14 (1985) (holding that "[f]or purposes of this opinion, we accept the Commission's factual finding that tenosynovitis is a disease").

These decisions do not conflict with *Merillat* or with *Holly Farms v. Yancey*, 228 Va. 337, 340, 321 S.E.2d 298, 300 (1984), in which the Supreme Court held, respectively, that rotator cuff tears and back strains were not diseases, but rather, were gradually incurred injuries. Although the rotator cuff tear at issue in *Merillat* was found to have been an injury that resulted from repetitive motion, a tear, like a break, sprain, or strain, involves "mechanical or structural changes in the

body." Tendon sheath disorders, such as CTS, tendinitis, tenosynovitis, and de Quervain's disease, caused by *"repeated strain or trauma,"* involve inflamed or irritated tissue, Tver & Anderson, *Industrial Medicine Desk Reference* 282 (1986) (emphasis added), which is a significant factor in determining how the condition pathologically develops.

We reaffirm our holdings that CTS resulting from repetitive motion or cumulative trauma is a disease and may be compensable as an occupational disease or an ordinary disease of life under the Act. Because the only issue before us on appeal is whether the claimant's CTS is a disease, we do not address whether CTS can be compensable as an occupational disease under Code § 65.2–400 or whether it must qualify as a compensable ordinary disease of life under Code § 65.2–401. Accordingly, we affirm the commission's award.

*Affirmed.*