### Salem

ISSAC PENLEY

v.

ISLAND CREEK COAL COMPANY

No. 0666-88-3

Decided June 6, 1989

COUNSEL

Jerry O. Talton, for appellant.

Michael F. Blair (Penn, Stuart, Eskridge & Jones, on brief), for appellee.

OPINION

BENTON, J.—On this appeal Issac Penley asserts that the commission erroneously concluded that his evidence failed to prove coal worker's pneumoconiosis. He contends that Code § 65.1-56.1 required the commission to conclude that he had coal worker's pneumoconiosis because he proved both injurious exposure to coal dust and the existence of opacities in his lung that are characteristic of some type of pneumoconiosis.[1] He further contends that the

---

[1] Code § 65.1-56.1 was enacted in 1972 and provides in pertinent part as follows:

Notwithstanding any other provisions in this Act, on and after July 1, 1973, or any extended date allowed for state workers' compensation laws to comply with the standards imposed by the United States Department of Labor acting under the provisions of Title 4, part C, section 421

(a) of Public Law 91-173 (the 1969 Federal Coal Mine Health and Safety Act) and any subsequent amendments thereto [*see* 30 U.S.C.A. § 901, *et seq.*], any employee having a claim for coal worker's pneumoconiosis benefits shall be compensated according to the following schedule:

(1) For coal worker's pneumoconiosis medically determined to be in the first category where there is no present impairment for work, 66 ⅔ percent of the average weekly wage during the three years prior to the filing date, for fifty weeks, up to 100 percent of the average weekly wage of the Commonwealth as defined in § 65.1-54.

(2) For coal worker's pneumoconiosis medically determined to be in the second category where there is no present impairment for work 66 ⅔ percent of the average weekly wages for ninety weeks, up to 100 percent of the average weekly wage of the Commonwealth as defined in § 65.1-54.

(3) For coal worker's pneumoconiosis medically determined to be in the third category and involving progressive massive fibrosis or medically classified as being A, B or C under the Unione Internationale Contra Cancer or International Labor Organization (hereafter referred to as U.I.C.C. or I.L.O.) classifications but where there is no apparent impairment for work, 66 ⅔ percent of the average weekly wages, for 200 weeks, up to 100 percent of the average weekly wage of the Commonwealth as defined in § 65.1-54.

\*     \*     \*     \*

In any case where there is a question of whether a claimant with pneumoconiosis is suffering from coal worker's pneumoconiosis or from some other type of pneumoconiosis such as silicosis it shall be conclusively presumed that he is suffering from coal worker's pneumoconiosis if he has had injurious exposure to coal dust.

commission's pneumoconiosis guide is outdated because it was adopted for use in connection with Code § 65.1-56 and is inconsistent with Code § 65.1-56.1.[2] For the reasons that follow we reverse the commission's decision and remand this case for further proceedings.

I

Coal worker's pneumoconiosis is a disease of the lung that results from the accumulation of coal dust in the lungs. *Consolidation Coal Co. v. Chubb*, 741 F.2d 968, 970-71 (7th Cir. 1984); 1B A. Larson, *Workmen's Compensation Law* § 41.91(a) (1987). It can be diagnosed by a qualified physician through interpretation of radiographic images of the lungs. *See Chubb*, 741 F.2d at 971-74. Dr. N. LeRoy Lapp, the author of numerous publications on the topic of lung disease, has described the radiology of coal worker's pneumoconiosis in the following concise, understandable

---

[2] In 1971 the Commission adopted a pneumoconiosis guide which states:

The Industrial Commission of Virginia has agreed [1971] to use the following as a means of medically determining the stages of the pneumoconioses as provided for by § 65.1-56, Code of Virginia.

|  | ILO* | UIC/CINCINNATI** |
|---|---|---|
| First Stage | p 1 & 2 | p 1 & 2 |
|  | M1 | q 1 |
| Second Stage | p 3 | p 3 |
|  | m 2 & 3 | q 2 & 3 |
|  | n 1, 2 & 3 | r 1, 2 & 3 |
| Third Stage | A | A |
|  | B | B |
|  | C | C |

*ILO = International Labour Organization Classification (1958).

**UICC/CINCINNATI = International Union Against Cancer Classification (1968) (Unione Internationale Contra Cancer)

The Virginia Workmen's Compensation Act, Ann. 244 (Michie 1982).

Code § 65.1-56(20) still contains the following reference to coal workers' pneumoconiosis:

(20) For the pneumoconiosis, including, but not limited to silicosis, asbestosis, coal miner's pneumoconiosis and byssinosis, medically determined to be in the:

(a) First stage, sixty-six and two thirds percent of the average weekly wages during fifty weeks.

(b) Second stage, sixty-six and two-thirds percent of the average weekly wages during 100 weeks.

(c) Third stage, sixty-six and two-thirds percent of the average weekly wages during 300 weeks.

terms:

Simple [coal worker's pneumoconiosis] is classified into categories 1,2, and 3 according to the profusion (number per unit area) of small rounded opacities (shadows or nodules) in the lung fields of a radiograph of the chest. When the number of small opacities is insufficient to make a diagnosis of category 1, the file is classified as category 0 or negative ("normal"). The International Labour Organization (ILO) made the first attempt to codify the interpretations of chest radiographs for pneumoconiosis in 1958. This was followed by a scheme devising a twelve-point elaboration of the ILO classification system that rendered it more sensitive for the purpose of reading radiographic progression. In this latter study, each major category, including zero, was divided into three subcategories, so that in the full elaboration there were 12 categories ranging from 0/- to ¾.
RELATIONSHIPS BETWEEN PROFUSION ON THE ELABORATED ILO U/C AND THE SHORT FORM CLINICAL CLASSIFICATION OF THE RADIO-GRAPHIC APPEARANCES OF THE PNEUMOCONIOSES

| 0/0      0/1 | 1/0      1/1      1/2 | 2/1      2/2      2/3 | 3/2      3/3      3/4 |
|---|---|---|---|
| Category 0 | Category 1 | Category 2 | Category 3 |
| No Pneumoconiosis | Definite Pneumoconiosis | | |

For example, when a radiograph is being classified and the reader initially considers category 1, but eventually decides there are too few opacities, causing the correct classification to be category 0, then the classification of that radiograph is 0/1. The same applies to categories ½, 2, ⅔, 3 and ¾. The numerator represents the category in which the film is placed, and the denominator represents the category that was also considered. If the interpretor does not consider any other category but the one in which he places it, then the film is classified as 1, 2, or 3.

Small opacities are also classified as to whether they are regular (rounded) or irregular (linear, reticular). The regular or rounded opacities are primarily seen on the radiographs of

coal miners. The regular opacities are classified according to size, pinhead (p), ranging up to 1.5 mm. in diameter, micronodular (q), ranging from 1.5 to 3.0 mm. in diameter and nodular (r) ranging from 3.0 to 10.0 mm. in diameter. Irregular opacities are commonly seen in asbestosis and certain other interstitial reactions but are infrequent among coal miners. When present among coal miners, these irregular opacities relate more to cigarette smoking than to dust retention. The irregular opacities are also classified by size into (s), up to 1.5 mm., (t) between 1.5 and 3.0 mm., and (u) between 3.0 and 10.0 mm. in width, according to the latest classification scheme.

Lapp, *A Lawyer's Medical Guide to Black Lung Litigation*, 83 W. Va. L. Rev. 721, 729-31 (1981) (footnotes omitted). When the reader of a radiograph finds mixed shapes (or sizes) of small opacities, "the predominant shape and size is recorded first [and] [t]he presence of a significant number of another shape and size is recorded after the oblique stroke." Department of Labor, Criteria for Use of ILO 1980 International Classification of Radiographs of the Pneumoconiosis.

## II

Issac Penley was employed as a coal miner by Island Creek Coal Company for approximately 28 years. Penley was first notified by Dr. J. P. Sutherland that a radiograph revealed "opacities in all six lung zones read by us according to the New ILO-80 Classification as ⅔ p Pneumoconiosis." Sixteen additional physicians interpreted the radiograph and submitted their diagnoses to the commission. Of the sixteen interpretations, the reports of seven unrelated physicians, Drs. DeRamos, Brandon, Fisher, Sutherland, Penman, Modi, and Aycoth, contained positive diagnoses of pneumoconiosis.[3] Drs. Wershba, Gogineni, Nichols, Binns and Duncan, all of Kanawa Valley Radiologists, Inc., each reported "no evidence of occupational pneumoconiosis." Dr.

---

[3]  These doctors made the following classifications of the opacities:

| Dr. DeRamos | 1/1 | p/q |
|---|---|---|
| Dr. Brandon | 1/0 | p |
| Dr. Fisher | 1/1 | q/t |
| Dr. Sutherland | ⅔ | p |
| Dr. Penman | 1/1 | p |
| Dr. Modi | 1/1 | q |
| Dr. Aycoth | 2/1 | p/q |

Zaldivar also reported that the radiograph showed neither "pleural [nor] parenchymal abnormalities consistent with pneumoconiosis." Drs. Gaziano, Castle, Hippensteel and Stewart all identified "parenchymal abnormalities consistent with pneumoconiosis."[4]

Based on this evidence, the deputy commissioner found that Dr. Sutherland and six other doctors diagnosed "positive for Stage 1 coal workers' pneumoconiosis," that five other doctors diagnosed "negative for occupational disease," and that Drs. Gaziano, Castle, Hippensteel, and Stewart made diagnoses "consistent with coal workers' pneumoconiosis, however, their findings are below those required for Stage 1." Upon those findings the deputy commissioner concluded that Penley established by "a preponderance of the evidence . . . Stage 1 coal workers' pneumoconiosis" and awarded permanent partial disability benefits. Reversing the deputy's decision, the full commission concluded "that Dr. Castle, Dr. Gaziano, Dr. Hippensteel and Dr. Stewart's interpretations are negative findings, so [Penley] has not carried the burden of proof by a preponderance of the evidence." In arriving at this conclusion, the commission stated:

> The "s" opacities are generally fine irregular or linear and not characteristic of coal workers' pneumoconiosis. The same comments apply to the "t" opacities which are somewhat larger than "s." "Q" opacities are indicative of coal workers' pneumoconiosis. Drs. Castle and Gaziano reported a profusion of opacities which are not indicative of coal workers' pneumoconiosis. Drs. Hippensteel and Stewart reported some opacities indicative of coal workers' pneumoconiosis, i.e., those identified as "q" and some which were not, i.e., those identified as "t", but the profusion was not sufficient to establish coal workers' pneumoconiosis and, thus, the reading 0/1.

---

[4] They classified the opacities as follows:

| | | |
|---|---|---|
| Dr. Gaziano | 0/1 | s |
| Dr. Castle | 0/1 | s/t |
| Dr. Hippensteel | 0/1 | q/t |
| Dr. Stewart | 0/1 | q/t |

## III

■ Code § 65.1-56.1 mandates that, "[n]otwithstanding any other provisions in this Act, . . . any employee having a claim for coal worker's pneumoconiosis benefits shall be compensated" according to the "category" of the disease as scheduled in the statute. In addition, the statute requires the commission to conclusively presume coal worker's pneumoconiosis "[i]n any case where there is a question of whether a claimant with pneumoconiosis is suffering from coal worker's pneumoconiosis or from some other type of pneumoconiosis" and where that claimant has been "injurious[ly] exposure[d] to coal dust." Penley contends that the commission erred because, in determining that he had not proved coal worker's pneumoconiosis, the commission did not give him the benefit of the conclusive presumption the General Assembly specifically enacted to address coal workers' pneumoconiosis.

Both decisions below refer to a "stage" of pneumoconiosis (the terminology of the 1971 guide and Code § 65.1-56), rather than a "category" of pneumoconiosis (the terminology of Code § 65.1-56.1). The deputy commissioner considered the varying diagnoses of the several doctors "in conjunction with the fact that [Penley] has worked approximately 28 years . . . in the coal mines" and concluded that "a preponderance of the evidence establishes that [Penley] has contracted Stage 1 coal workers' pneumoconiosis." The deputy entered an award "for Stage 1 coal workers' pneumoconiosis in the amount of $326, commencing November 2, 1987, and continuing for 50 weeks" a period of time consistent with Code § 65.1-56(20)(a) first stage pneumoconiosis. On review, the full commission framed the issue raised by Island Creek as whether the "evidence establishes the presence of first stage coal workers' pneumoconiosis."

By framing the issue in terms of "stages" (the terminology of Code § 65.1-56), the commission's decision implicitly brings into question whether Code § 65.1-56.1 was considered in deciding Penley's claim. Whether the commission considered the provisions of Code § 65.1-56.1 is of significance because, unlike Code § 65.1-56, Code § 65.1-56.1 contains the presumption Penley seeks. The record contains no express indication that the commission applied Code § 65.1-56.1 in deciding this case. The commission made no specific finding in this regard, nor did it refer to the statute at any

point in its decision.

Even if we found from the record that the commission did apply Code § 65.1-56.1, the commission's statement of factual findings relevant to deciding whether the presumption should apply is inadequate. In its decision, the full commission discussed only the four diagnoses that the deputy commissioner described "as being consistent with coal workers' pneumoconiosis, however, . . . below . . . Stage 1." Although all four doctors reported "parenchymal abnormalities consistent with pneumoconiosis" the commission concluded that "Drs. Castle and Gaziano reported a profusion of ["s" "t"] opacities which are not indicative of coal workers' pneumoconiosis" and "Drs. Hippensteel and Stewart reported some opacities indicative of coal workers' pneumoconiosis . . . but the profusion was not sufficient to establish coal workers' pneumoconiosis." These findings leave open the question whether, although not indicative of coal worker's pneumoconiosis, the opacities and profusion are indicative of some other form of pneumoconiosis. Such a finding would be significant because, in order to reap the benefits of the statutory presumption, Penley was required to prove, as a threshold matter, that he suffered from some form of pneumoconiosis. If in taking the series of reports as a whole, the commission could conclude that "there is a question of whether [Penley] . . . is suffering from coal worker's pneumoconiosis or from some other type of pneumoconiosis" a conclusive presumption would arise that Penley suffered from coal worker's pneumoconiosis because it is undisputed that he was injuriously exposed. On this record, we cannot say that the commission assessed the applicability of the presumption to Penley's claim.

Moreover, we cannot conclude with any degree of confidence, based on the record before us, that the commission would find, as suggested by Island Creek, that whenever a pneumoconiosis reading is below first stage it is necessarily below first category. Uncertainty arises in attempting to align the "stages" with "categories." For example, it appears on this record that an opacity classification of 2 p would be indicative of first stage coal workers' pneumoconiosis using the 1971 guide. That same classification, however, would be indicative of the second category, as that term is used on the 1980 ILO Classification.

■ In addition, the physicians' interpretations of the radiograph differed significantly. The commission may have considered the

expertise of the several physicians in reaching its conclusion. The record reflects that Doctors Brandon and Fisher are "B" readers. The rating of "B" apparently denotes a reader of greater proficiency and experience than "A" readers. *Chubb*, 741 F.2d at 971, n.2; *Sharpless v. Califano*, 585 F.2d 664, 666 n.5 (4th Cir. 1978). The record does not reflect the ratings of any of the other physicians. Although all five physicians from the same medical group made identical negative diagnoses, we have no basis upon which to comment upon the proficiency of the physicians in interpreting the radiographs. *See generally* Morgan, *Proficiency Examination of Physicians for Classifying Pneumoconioses Chest Films*, 132 Am. J. Roentgenology 094 803-08 (1979); Roger & Morgan, *On the Factors Influencing Consistency in the Radiological Diagnoses of Pneumoconiosis*, 102 Am. R. Respir. Dis. 905 (1970). Questions raised by conflicting medical opinions must be decided by the commission. *Dept. of Corrections v. Powell*, 2 Va. App. 712, 714, 347 S.E.2d 532, 533 (1986). Whether Penley has sufficiently established pneumoconiosis, or whether the threshold requirement has been met to trigger the statutory presumption, is a factual finding that should be made by the commission based upon the evidence and the appropriate legal standard. Because we cannot on this record determine the basis of the commission's decision we must remand this appeal to the commission for reconsideration and for additional findings consistent with this opinion.

IV

Penley also contends that the 1971 pneumoconiosis guide is outdated and that the commission's continued use of that guide is inconsistent with Code § 65.1-56.1. Island Creek responds that we need not address Penley's contention because the majority of the doctors' interpretations "are neither [first] stage . . . nor [first] category, even if there is a difference between the stages and categories." For the reasons previously stated, we conclude that this question requires a factual finding by the commission. We find no evidence in the record, however, to suggest that the parties raised this issue before either the deputy or the full commission. Accordingly, we do not address this contention. Rule 5A:18. Because we

remand this case to the commission for further proceedings, the parties will have an opportunity to present this question to the commission and to adequately develop the factual issues on the record.

*Reversed and remanded.*

Coleman, J., and Duff, J., concurred.