COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Elder and Overton
Argued at Richmond, Virginia


NORTHSIDE ELECTRIC COMPANY and
 PENNSYLVANIA GENERAL INSURANCE
 COMPANY
                                    MEMORANDUM OPINION* BY
v.  Record No. 3105-96-2           JUDGE JAMES W. BENTON, JR.
                                         JUNE 24, 1997
NORBERT STEWART HICKS


          FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

          Bradford C. Jacob (William C. Walker; Taylor &
          Walker, P.C., on brief), for appellants.

          B. Mayes Marks, Jr., for appellee.



     The Workers' Compensation Commission awarded Norbert S.

Hicks disability benefits for various periods and the reasonable

cost of his medical care.  Northside Electric Company contends

that the commission erred in finding (1) that Hicks' hearing loss

was causally related to his injury by accident, and (2) that

treatment by three physicians was authorized.  We affirm the

award.

                              I.

     The principle is well established that the commission's

factual findings are conclusive and binding on this Court if they

are supported by credible evidence.  See Code § 65.2-706;

Manassas Ice & Fuel Co. v. Farrar, 13 Va. App. 227, 229, 409

S.E.2d 824, 826 (1991).  "The actual determination of causation

_____
          *Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

is a factual finding that will not be disturbed on appeal if there is credible evidence to support the finding." Ingersoll-Rand Co. v. Musick, 7 Va. App. 684, 688, 376 S.E.2d 814, 817 (1989).

"Following established principles, we review the evidence in the light most favorable to the prevailing party." R.G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990). So viewed, the evidence proved that during Hicks' employment with Northside Hicks suffered an electrical shock while repairing a neon light. Hicks reached into an electrical box and was shocked with 15,000 volts of electricity. No controversy exists concerning the occurrence of this event.

Hicks testified that he immediately noticed a change in his hearing. Before the accident, Hicks owned hearing aids but only wore them when he went to church. He did not wear them to work and did not have them with him when the accident occurred. After the accident, Hicks had to turn the television up louder to hear it. Hicks also testified that he had to adjust his hearing aids to the highest volume setting to hear.

During the course of treatment for numbness and back pain caused by the shock, Hicks went to see Dr. Alvin Goldstone, an otolaryngologist who had been treating Hicks for approximately 20 years for hearing problems. Dr. Goldstone had previously diagnosed Hicks with "sensory neural hearing loss." Dr. Goldstone opined that Hicks' hearing problems were "aggravated,

exacerbated, and/or accelerated when he was shocked with a high voltage of electricity on June 8, 1995."  Dr. Goldstone reported "sensory neural loss of hearing, which has worsened."

Dr. Leslie S. Kreisler, a doctor hired by the employer, examined Hicks and disagreed with Dr. Goldstone's opinion.  Dr. Kreisler stated that there was "no true documentation of sound levels or progression before or after the injury."  Dr. Kreisler concluded that he could not "state with any reasonable degree of medical probability whether the electric shock injury increased . . . Hicks['] loss."

The commission found Dr. Goldstone's testimony and reports to be credible.  In particular, the commission made the following findings:

It was initially Dr. Goldstone's opinion, as set forth in his narrative reports, that the increase in the loss of hearing was caused by the electrical shock. . . .  The increase in the loss of hearing since [Hicks'] last visit on November 25, 1991, is documented.  When Dr. Goldstone saw [Hicks] on January 5, 1996, some seven months after the industrial accident, he was not aware of the limited duck hunting with a shotgun in November or December 1995.

It remained Dr. Goldstone's opinion that the electrical shock caused the increase in the hearing loss, although he acknowledged, with refreshing candor, that he could not explain exactly how an electrical current passing through the body could cause this result.  Repeated efforts to have him testify that [Hicks] was malingering was unsuccessful, and he did not waiver from his opinion on causation.  Neither was Dr. Goldstone impressed with the limited hunting activities.  Finally, it is clear that his opinion as to causation was based largely on

- 3 -

the history of hearing loss immediately following the shock. However, Dr. Goldstone also described [Hicks'] frankness and the reasons he felt that he was a reliable historian. The Deputy Commissioner's finding that the employer is responsible for the cost of this medical treatment for the increase in hearing loss, commencing with January 5, 1996, is supported by the record and is affirmed upon Review. The finding, as to those issues raised by the employer upon Review, are, therefore, affirmed.

Northside argues that Dr. Kreisler's opinion was more credible. The principle is well established that "[a] question raised by conflicting medical opinion is a question of fact." Commonwealth v. Powell, 2 Va. App. 712, 714, 347 S.E.2d 532, 533 (1986). Thus, "[q]uestions raised by conflicting medical opinions must be decided by the commission." Penley v. Island Creek Coal Co., 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989).

The commission was not required to accept Dr. Kreisler's opinion that he was unable to find that the shock increased Hicks' hearing loss. Although Dr. Kreisler noted that psychiatrists that perform electroshock therapy using 150 to 180 volts have not documented cases of hearing loss, the evidence in this case is that Hicks came in contact with a 15,000 volt electrical line. The commission weighed the conflicting reports and provided a cogent reason for accepting Dr. Goldstone's opinion. Accordingly, we hold that Dr. Goldstone's opinion that the severe electrical shock aggravated Hicks' underlying condition is credible evidence that supports the award. Cf. Farrar, 13 Va. App. at 233-34, 409 S.E.2d at 828.

- 4 -

After Hicks reported the incident to his supervisor, Northside did not give Hicks a panel of doctors to choose from. Hicks visited Dr. Martirosian, a cardiologist he had previously seen for an enlarged valve in his heart. Dr. Martirosian ordered tests and could not determine what was wrong with Hicks. Hicks then went to see Dr. Melhorn, an osteopath Hicks considered to be his family doctor. Dr. Melhorn sent Hicks to have an MRI, which indicated that nothing was wrong with Hicks' lower back.

Dr. Martirosian referred Hicks to Dr. Velo, a neurosurgeon. Dr. Velo concluded that Hicks' "trouble was in [his] neck" and recommended surgery. Hicks' wife talked to Northside's insurance representative and told the representative that Hicks had seen Dr. Martirosian, Dr. Velo, and Dr. Melhorn. At that time, Hicks had not seen any other doctors. The representative did not tell Hicks' wife to take Hicks to a particular doctor or to continue seeing Dr. Velo.

Hicks talked to Dr. Velo about the possibility of a second opinion. Hicks mentioned to Dr. Velo that he wanted to see Dr. Isaacs, a doctor that had been treating Hicks' wife. Dr. Isaacs examined Hicks and noted in his report that he reviewed Dr. Velo's reports. Dr. Isaacs sent a copy of his report to Dr. Velo. After examining Hicks, Dr. Isaacs referred Hicks to Dr. Allen.

Hicks initially met with Dr. Allen and later was treated by

Dr. Allen's partner, Dr. Melisi, when Dr. Allen was out of the country. Northside's insurance carrier eventually referred Hicks' wife to a nurse who worked for the insurance carrier. Hicks' wife told the nurse that Hicks had seen Drs. Martirosian, Velo, Isaacs, and Allen. The nurse told Hicks' wife that Dr. Allen belonged to "a good group of doctors." Dr. Allen recommended, and Dr. Melisi ultimately performed, the same surgery Dr. Velo had originally recommended.

The commission made the following findings:
> The initial course of treatment through Dr. Velo's last examination on October 3, 1995, is not contested by [Northside] . . . .
> We find that the course of treatment commencing with Dr. Isaacs was upon referral, rather than a change in physicians initiated by [Hicks], as argued by [Northside] upon Review. Surgery was recommended and he was clearly within his rights in requesting a second opinion. Dr. Velo acquiesced and referred [Hicks] for this purpose. However, Dr. Isaacs did not undertake treatment but only evaluated him as requested. He reported his findings to Dr. Velo and recommended against surgery, but at the same time, referred [Hicks] for further neurologic evaluation. At that point, surgery was recommended, and he came under the care of Dr. Allen and physicians in his medical group. Dr. Velo did not see [Hicks] after October 3, 1995, and there is no duplication of medical treatment. [Northside's] insurance carrier was clearly informed of this course of treatment commencing with Dr. Isaacs and offered no objection. The record establishes a clear chain of referrals by treating physicians for the industrial injury. The Deputy Commissioner's finding that [Northside] should be responsible for the cost of treatment by Drs. Allen, Melisi, and Isaacs, as well as the cost of surgery, is, therefore, affirmed.

Credible evidence in the record supports the commission's finding that when Dr. Velo recommended surgery, Hicks appropriately requested a second opinion. That Hicks suggested to Dr. Velo that Dr. Isaacs be the physician to render a second opinion is of no moment. Dr. Isaacs examined Hicks, reviewed Dr. Velo's reports, and advised Dr. Velo of his findings. The commission's finding that Dr. Velo acquiesced in both the review by Dr. Isaacs and the later referral is supported by the record. "If there is evidence or reasonable inference that can be drawn from the evidence to support the [c]ommission's findings, they will not be disturbed by this Court on appeal . . . ." Caskey v. Dan River Mills, Inc., 225 Va. 405, 411, 302 S.E.2d 507, 510–11 (1983). We do not retry the facts or review the weight of the evidence. See id.

In addition, the record is uncontradicted that Northside failed to provide Hicks with the opportunity to select a physician from a panel of at least three physicians as required by Code § 65.2-603(A)(1). Also uncontradicted is the evidence that Hicks' wife contacted Northside's insurance carrier when Hicks was seeking treatment from various doctors. The carrier's silence and the nurse's positive comments regarding Dr. Allen were reasonably interpreted by Hicks as authorization for the treatment.

For these reasons, we affirm the award.

Affirmed.