COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, McClanahan and Alston
Argued at Alexandria, Virginia


MARIA T. CHIRINO

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1166-10-4          JUDGE ELIZABETH A. McCLANAHAN
                                                    JANUARY 25, 2011

PRINCE WILLIAM COUNTY SCHOOL BOARD AND
  VIRGINIA MUNICIPAL GROUP
  SELF-INSURANCE ASSOCIATION


                FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Kathleen G. Walsh (Law Office of Kathleen Grace Walsh, on brief),
            for appellant.

            Ralph L. Whitt, Jr. (Corey R. Pollard; Whitt & Del Bueno, on
            brief), for appellees.


        Maria T. Chirino appeals a decision of the Workers' Compensation Commission denying

her claim for benefits.  Chirino contends the commission erred in finding she did not prove she

developed a frozen shoulder as a compensable consequence of her workplace accident.  Finding

no error in the commission's findings, we affirm its decision.

                                    I.  BACKGROUND

        On appeal from a decision of the commission, "we view the evidence in the light most

favorable to the party prevailing below" and grant that party the benefit of all reasonable

inferences.  Tomes v. James City (County of) Fire, 39 Va. App. 424, 429-30, 573 S.E.2d 312,

315 (2002) (citation omitted); see also Grayson (County of) Sch. Bd. v. Cornett, 39 Va. App.

279, 281, 572 S.E.2d 505, 506 (2002).

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Chirino, employed as a custodian for Prince William County School Board, sustained a fractured sternum on April 12, 2005, when she was assaulted by a supervisor while cleaning a classroom. Under an award for temporary partial disability, the School Board has paid medical benefits and periods of wage loss benefits to Chirino.

Chirino now seeks benefits for an alleged frozen right shoulder and contends it is a compensable consequence of her fractured sternum. Dr. Richard Layfield, an orthopedist, treated Chirino for her fractured sternum. When he initially evaluated Chirino ten days after the accident, she complained of pain in her midchest and radiating into her shoulders when reaching. Dr. Layfield told Chirino this would be a difficult problem because the muscles in her upper extremity are linked to the chest wall such that lifting, pushing, and pulling would bother her until her fracture healed. He prescribed rest and excused Chirino from work. When Dr. Layfield examined Chirino on May 6, he found limited abduction and external rotation due to pain. He returned Chirino to light-duty work with no lifting over three pounds and explained that her injury would resolve in time. On May 27, Dr. Layfield reported improvement in Chirino's symptoms and noted she was moving her arms better. Although Chirino had poor external rotation strength, her forward flexion was improved and she exhibited no shoulder tenderness and intact neurovascular signs. Dr. Layfield increased her lifting to five pounds and referred her to physical therapy. Chirino attended physical therapy sessions approximately nine times during June. When Chirino returned to Dr. Layfield on July 1, she told him the physical therapy made her worse because they were making her lift and perform other uncomfortable activities. Chirino reported pain when lifting either arm, but especially on the left side, and exhibited limited abduction because of pain. She also complained of pain with deep breathing. On August 1, Chirino returned to Dr. Layfield with continuing complaints of pain over her sternum, difficulty moving her arms, and pain with deep breathing. Dr. Layfield noted Chirino was neurovascularly

intact in the bilateral upper extremities. A bone scan, ordered by Dr. Layfield, was performed on August 19 and showed a healed fracture. When Chirino returned to Dr. Layfield on August 29, she was still complaining of pain over her sternum, pain with deep breathing, and pain when elevating her arms above 90 degrees. However, Dr. Layfield saw no orthopedic problem and released her to return to regular work without restrictions on September 9. Chirino attended additional physical therapy sessions in September and October.

Dr. Deeni Bassam, board certified in anesthesiology and pain management, began treating Chirino in October for her continued complaints of pain from the sternum fracture. When he initially evaluated Chirino, he noted she was experiencing pain in the lower sternum area with mild radiation to her shoulders.[1] Dr. Bassam prescribed a course of anti-inflammatory medication. When Chirino returned to Dr. Bassam in November, she reported a 40% improvement in her overall pain but complained of continued pain over her sternum. She requested a cortisone injection, which was administered. In January 2006, Chirino returned to Dr. Bassam with the same complaints of pain in her sternum radiating to her shoulders. Dr. Bassam believed Chirino had reached maximum medical improvement and recommended a functional capacity evaluation to determine her level of disability.

Chirino underwent the functional capacity evaluation in February 2006.[2] The evaluator noted that Chirino exhibited many inconsistencies and perceived herself as severely disabled. Chirino had normal strength and range of motion except for the bilateral shoulders. According to the evaluator, Chirino "chose to present herself as an individual with bilateral frozen shoulders,

_____

[1] In deposition testimony, Dr. Bassam stated that pain from the fracture site radiating secondarily into the shoulders must be distinguished from primary pain in the shoulders, which Chirino was not experiencing at that time.

[2] Due to Chirino's elevated blood pressure readings, portions of the physical demand level testing were not completed.

- 3 -

secondary to pain, in the examination room." However, Chirino's functional activities observed outside the examination room revealed a full active internal and external rotation of each shoulder to 90 degrees. The evaluator found no objective evidence to support Chirino's subjective complaints of pain and concluded that Chirino was capable of modified duty.

Dr. Bassam continued Chirino on the anti-inflammatory medication, administered another trigger point injection in April, and placed her on light duty. When Chirino returned to Dr. Bassam in July 2007, Chirino told Dr. Bassam she occasionally wore a soft neck brace because she felt the chest pain was causing pulled neck muscles. Dr. Bassam advised Chirino that her neck pain was not connected to the chest wall fracture and administered another trigger point injection. Dr. Bassam continued to see Chirino in 2008 for her complaints of chest pain. Noting that her blood pressure was under better control, he referred Chirino for another functional capacity evaluation to document her level of disability and guide her work restrictions.

A second functional capacity evaluation was performed in June 2008. The evaluator noted significant strength and mobility improvement in Chirino's left shoulder, but diminished right shoulder mobility due to disuse and protective posturing. According to the evaluator, the restrictions in Chirino's shoulder were "in conflict with her observed functional activities outside the examination room." Finding no evidence of muscle atrophy in either arm, the evaluator stated Chirino's complaints were not supported by objective findings and there was no pathology to support Chirino's choice not to use her right upper extremity. The evaluator concluded Chirino was capable of modified duty.

Due to the new complaints regarding her right shoulder, Dr. Bassam referred Chirino to Dr. Keith Albertson, an orthopedist.[3] When Dr. Albertson examined Chirino in August 2008,

_____

[3] At his deposition, Dr. Bassam testified that this was the first complaint Chirino had made of primary pain in the shoulder (as distinguished from pain radiating secondarily into the shoulders).

- 4 -

she reported having suffered right shoulder pain for three years. Dr. Albertson diagnosed a potential frozen shoulder and recommended physical therapy and an MRI scan. Dr. Albertson reviewed Chirino's medical records in November 2008 and was unable to find anything in her records that related her right shoulder complaints to her work injury. He advised Chirino he had provided her with the maximum number of injections and had nothing further to offer without authorization of an MRI scan. In response to questions submitted by the School Board in January 2009, Dr. Albertson stated he cannot, at the present time, "make a diagnosis with respect to Ms. Chirino's right shoulder and cannot causally relate her right shoulder complaints to the April 12, 2005 accident at work in which she fractured her sternum." Furthermore, Dr. Albertson stated that

> [a]fter having recently reviewed additional medical records from Dr. Bassam, Dr. Layfield and the functional capacity evaluations performed on February 2, 2006 and June 4, 2008, it is my medical opinion to a reasonable degree of medical probability that Ms. Chirino is capable of working at the level and with the restrictions set forth in the June 4, 2008 functional capacity evaluation.

In deposition testimony given in January 2009, Dr. Bassam testified he did not see any pathology to correlate with the degree of disability and pain claimed by Chirino this far out from her sternum fracture. According to Dr. Bassam, "from any objective measurement of pathology that we have in today's medicine, I cannot see why there is such a degree of pain and disability being presented by the patient" and "I cannot tie that to any objective scientific evidence seen in her workup over the years." Dr. Bassam testified he agreed with and adopted the findings of the June 2008 functional capacity examination.

In February 2009, Chirino sought an "independent medical examination" by Dr. John Bruno, an orthopedic surgeon. Chirino told Dr. Bruno she initially suffered pain in the front of her chest and right shoulder and that "her injury was neglected and finally denied with regard to her right shoulder." After reviewing Chirino's medical records and performing a "limited"

- 5 -

examination, Dr. Bruno concluded Chirino suffered a frozen right shoulder as a direct result of her work injury. At the hearing, Dr. Bruno testified that after Chirino fractured her sternum, "she stopped moving her arm and it became scarred and painful." According to Dr. Bruno, an MRI was not necessary to diagnose a frozen shoulder. "A frozen shoulder is very easy to diagnose, you simply ask the patient to move her arm and then you move it for her to the extent that you can. You compare the range of motion to what you know is normal." Dr. Bruno stated that the regression in the range of motion in Chirino's shoulder noted on the July 1, 2005 record of Dr. Layfield signaled the onset of the frozen shoulder resulting from its immobilization. From that time, Dr. Bruno believed the condition was "neglected." Dr. Bruno testified he did not know how much Chirino actually did or did not use her arm after the accident and did not know why the condition did not also develop in Chirino's left shoulder. He agreed that a rotator cuff tear would cause similar symptoms. Dr. Bruno did not review Chirino's functional capacity evaluations, and when excerpts were provided to him during the hearing, he stated that functional capacity evaluations are "poor tests" and he has a "deep seated prejudice to the methodology of that so-called examination."

After a hearing on Chirino's change-in-condition application, the deputy commissioner found that claimant had sustained a frozen shoulder as a compensable consequence of her sternum fracture. The deputy commissioner stated that the concept of a frozen shoulder "was both not raised or even considered before Dr. Bruno"[4] and while Chirino's "reaction to the chest fracture was out of proportion to the injury," her "response to the fracture was to limit and then ultimately not use her arm." Reversing the deputy commissioner, the commission stated it was

---

[4] This statement by the deputy commissioner appears to be inaccurate since the records from Chirino's functional capacity evaluations indicate that she "chose to present herself as an individual with bilateral frozen shoulders" in February 2006, three years prior to her evaluation by Dr. Bruno.

- 6 -

"not persuaded by Dr. Bruno's conclusion that the frozen shoulder developed as a direct result of the industrial accident."[5] The commission reasoned that Dr. Bruno's opinion the frozen shoulder condition developed by July 1, 2005, contradicted the objective findings of the functional capacity evaluation of February 2006 since Chirino "clearly did not have this condition" at that time. The commission further explained that Dr. Bruno's opinion was contradicted by the observations of the functional abilities of the physical therapist who treated Chirino during June 2005. According to the commission, Dr. Bassam, who evaluated Chirino for an extended period of time, believed Chirino "exhibited multiple levels of symptom magnification and emphasized that no pathological reason existed for her to have severe pain and disability from a healed sternum fracture." Additionally, the commission explained that "the contemporaneous medical reports [of Drs. Layfield, Bassam, and Albertson] fail to substantiate an objective finding of a frozen shoulder resulting from the compensable injury." In sum, "[b]ased on the significant medical evidence from the claimant's other health care providers," the commission "assign[ed] little value to the assessment of Dr. Bruno, the claimant's IME physician who saw the claimant only twice, the first visit occurring almost four years after the accident."

## II. ANALYSIS

"In order to establish entitlement to compensation benefits, the claimant must prove, by a preponderance of the evidence, an injury by accident which arose out of and in the course of [her] employment." Classic Floors, Inc. v. Guy, 9 Va. App. 90, 95, 383 S.E.2d 761, 764 (1989) (citation omitted). Under the doctrine of compensable consequences, the employer's liability for the workplace injury extends to "'all the medical consequences and *sequelae* that flow from the primary injury.'" American Filtrona Co. v. Hanford, 16 Va. App. 159, 163, 428 S.E.2d 511, 513

---

[5] In fact, the commission stated it was "hard-pressed to find that the claimant suffered a legitimate problem with her right shoulder as alleged."

(1993) (quoting 1 Arthur Larson, The Law of Workmen's Compensation § 13.11 (1992)). "The doctrine applies 'when the injury does not arise on the day of the accident, but instead develops as a direct consequence of an initial injury.'" Berglund Chevrolet, Inc. v. Landrum, 43 Va. App. 742, 751, 601 S.E.2d 693, 697 (2004) (quoting Paul Johnson Plastering v. Johnson, 265 Va. 237, 244, 576 S.E.2d 447, 451 (2003)). Because there must be a direct causal link between the original injury and the additional injury for which compensation is sought, "the issue is 'essentially one of whether the medical evidence proves a causal connection between the primary injury and the subsequent occurrence.'" Id. (quoting Williams Indus. v. Wagoner, 24 Va. App. 181, 188, 480 S.E.2d 788, 791 (1997)). The commission's "determination of causation is a factual finding that will not be disturbed on appeal if there is credible evidence to support the finding." Ingersoll-Rand Co. v. Musick, 7 Va. App. 684, 688, 376 S.E.2d 814, 817 (1989). Accordingly, unless the evidence carried Chirino's burden of proof on causation as a matter of law, the commission's findings are binding and conclusive upon us. See Tomko v. Michael's Plastering Co., 210 Va. 697, 699, 173 S.E.2d 833, 835 (1970).

The commission concluded Chirino did not satisfy her burden of proving she developed a right frozen shoulder as a result of her sternum fracture. As the commission reasoned, neither Dr. Bassam nor Dr. Albertson could relate the claimed pain and disability in Chirino's shoulder to her workplace accident. Furthermore, the commission found Dr. Bruno's opinion unpersuasive and contradicted by the objective findings contained in Chirino's medical records. Indeed, Dr. Bruno's opinion that Chirino's shoulder condition was evident on July 1, 2005, and resulted from immobilization of her arm is directly at odds with Chirino's medical records showing that throughout the month of June 2005, she attended physical therapy sessions during which her right arm was treated and manipulated by the therapists. As fact finder, it was the commission's prerogative to determine what weight to

accord Dr. Bruno's medical opinion in determining whether she developed a frozen shoulder as a consequence of her fractured sternum. See Penley v. Island Creek Coal Co., 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989); Goodyear Tire & Rubber Co. v. Pierce, 5 Va. App. 374, 381, 363 S.E.2d 433, 437 (1987). "Questions raised by conflicting medical opinions" are factual issues, and as such "must be decided by the commission." Penley, 8 Va. App. at 318, 381 S.E.2d at 236. Thus, it was within the commission's discretion, in deciding causation, to give greater weight to Chirino's treating physicians' opinions than the opinion of Dr. Bruno.[6]

In view of such credible evidence, we will not disturb this factual finding on appeal. Accordingly, we affirm the commission's decision.

Affirmed.

---

[6] Although Chirino acknowledges the difficulty of her burden to convince this Court to overturn the opinion of the commission, she argues there "is no medical evidence" to support the findings of the commission. Chirino suggests that because Dr. Albertson and Dr. Bassam stated only that they could not relate her right shoulder complaints to her sternum fracture, there was no evidence from the School Board establishing affirmatively that her fractured sternum did not cause a frozen shoulder. But the School Board was not required to prove the absence of a causal link. Rather, Chirino bore the burden of proving she developed a frozen shoulder as a result of her sternum fracture. Classic Floors, Inc., 9 Va. App. at 95, 383 S.E.2d at 764. And the only evidence she presented was the opinion of Dr. Bruno, which was discounted by the commission.