COURT OF APPEALS OF VIRGINIA

Present: Judge Annunziata, Senior Judges Willis and Bray*
Argued at Alexandria, Virginia


PRO-FOOTBALL INC. AND
 GULF INSURANCE COMPANY

                                          OPINION BY
v.    Record No. 3427-01-4        JUDGE ROSEMARIE ANNUNZIATA
                                          SEPTEMBER 3, 2002
TITO J. PAUL


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Samuel L. Hendrix (Baker & Hostetler, on
        briefs), for appellants.

        Andrew S. Kasmer (Gerald Herz; Chasen &
        Boscolo, on brief), for appellee.


    Tito J. Paul filed for workers' compensation benefits with

the commission for an injury to his left knee incurred during

the course of his employment as a football player for

Pro-Football, Inc. (Washington Redskins or Redskins). A deputy

commissioner found that Paul's injury was compensable in

Virginia and entered an award of benefits pursuant to Code

§ 65.2-101. The Washington Redskins and Gulf Insurance Company

(insurer) appealed, and the full commission affirmed. The

Redskins contend (1) the commission lacked jurisdiction to enter

the award and (2) the evidence does not support the commission's

_____

        * Senior Judges Willis and Bray participated in the hearing
and decision of this case prior to the effective date of their
retirement on September 1, 2002 and thereafter by designation as
senior judges pursuant to Code § 17.1-401.

determination that the injury is compensable.  For the reasons that follow, we affirm.

## I.  Background

On May 7, 1998, Paul signed a two-year written contract with the Denver Broncos.  It is undisputed that Paul signed this contract in Colorado and that it committed Paul to work for the Broncos during the 1998 and 1999 football seasons.  The contract provided, inter alia:

> 17.  ASSIGNMENT.  Unless this contract specifically provides otherwise, [the Broncos] may assign this contract and Player's services under this contract to any successor to [the Broncos] franchise or to any other Club in the League.  Player will report to the assignee Club promptly upon being informed of the assignment of his contract and will faithfully perform his services under this contract.  The assignee club will pay Player's necessary traveling expenses in reporting to it and will faithfully perform this contract with Player.

On or about August 24, 1999, prior to the 1999 season, the Broncos traded Paul to the Redskins pursuant to a written agreement (Trade Agreement) between the Broncos and the Redskins.  The Trade Agreement provided, in pertinent part:

> A.  The Denver Broncos hereby assigns to the Washington Redskins all of its rights, title, and interest in and to the following players . . . : Tito Paul
>
> *      *      *      *      *      *      *
>
> The above transaction is subject to the following conditions:

- 2 -

> Tito Paul must report to the Redskins [in
> Ashburn, Virginia,] pass the Club's physical
> [examination, and] be on Washington's 53-man
> roster at anytime during the 1999 season.

After Paul reported to Redskins Park in Ashburn, Virginia and passed his physical examination, he and Vinnie Cerrato, the Director of Player Personnel, shook hands and Cerrato said, "congratulations, you are now a Redskin.

On August 28, 1999, Paul played in a game against the Pittsburgh Steelers in Pittsburgh, Pennsylvania.  Paul testified that during the game, he "was shedding a blocker, and [he] was going to make a tackle, and [he] made an abrupt turn, and [his] knee, [he] just felt a burning sensation, a tweaking in it." Paul continued to play in the remainder of the Pittsburgh game.

On September 1, Paul reported the injury to the team's assistant trainer, Kevin Bastin.  The Redskins and its insurer filed a First Report of Accident with the Workers' Compensation Commission.

Bastin first treated Paul.  He sent Paul to Dr. Gordon Avery.  Dr. Avery's report indicates that Paul "injured his left knee in a game last week."  Dr. Avery treated Paul four more times in September, three times in October and once in November.

On September 5, 1999, Dr. Joseph A. Backer performed an MRI examination on Paul's knee.  The study showed "findings suggestive of a strain of the lateral collateral ligament, abnormality of the anterior horn of the lateral meniscus,

- 3 -

questionable bone bruise in the medial femoral condyle, and a joint effusion," but "no complete tear" of the lateral collateral ligament. Dr. Avery also noted that the MRI indicated "some abnormality of the lateral meniscus but no definite tear."

In September and October, Paul continued to play for the Redskins. The team trainers' notes for this period indicate that Paul's condition subsided and then worsened. The entry for September 9 states that Paul "was able to practice all week with no problems. The swelling has decreased and he has full [range of motion] pain free." The September 12 entry states that he "was made [inactive] for the game, but not due to knee. He is treating post practice but is full go." The entries for September 29 and October 6 note swelling. The entry for October 18 indicated that Paul had his knee "drained by Dr. Avery before the game."

On October 26, Dr. Avery wrote that he suspected Paul suffered a "lateral meniscus tear." On November 16, 1999, Dr. Avery performed surgery on Paul's left knee. The operative report indicates that Paul had "a radial tear of the lateral meniscus" as well as "degenerative changes of the meniscus both anterior and posterior to the radial tear."

- 4 -

It is undisputed that Paul was unable to return to his pre-injury employment after the surgery. He continued to participate in non-physical team activities through the remainder of the 1999 season and was paid his full salary, $402,732.15. He has had three subsequent surgeries on his knee and has not yet been released by his treating doctor. Before the 2000 season, he was terminated by the Washington Redskins and received no further compensation.

On or about May 9, 2000, Paul filed a claim against the Redskins for workers' compensation benefits relating to his left knee injury. A deputy commissioner found that the commission had jurisdiction because the Trade Agreement constituted Paul's contract of employment with the Redskins, and was completed in Virginia. The commissioner also found that Paul had sustained a compensable injury by accident and awarded temporary total disability benefits from March 1, 2000.

The Redskins appealed to the full commission. The commission determined that the Trade Agreement was not Paul's contract of employment, but found that it had jurisdiction under the "loaned employee" doctrine. Specifically, it held that Paul had a "loaned employee relationship" with the Redskins that was consummated in Virginia when he passed a physical examination required by the Trade Agreement. The commission also affirmed the deputy commissioner's finding that Paul sustained a

compensable injury while in the course of his employment with
the Redskins.

## II.  Analysis

### A.  Jurisdiction

The commission concluded that it had jurisdiction based on
its finding that Paul was a "loaned employee" who consummated
his employment relationship with the Redskins in Virginia.
Specifically the commission found:  1) Paul was a loaned
employee of the Redskins; 2) the loaned employee relationship
was effectuated when Paul passed the Redskins physical in
Virginia; and 3) the effectuation of the relationship in
Virginia satisfied the Commonwealth's jurisdictional
requirements.  The commission's finding will be affirmed unless
it is unsupported by credible evidence.  See Virginia Electric
and Power v. Kremposky, 227 Va. 265, 269, 315 S.E.2d 231, 233
(1984); see also Code § 65.2-706(A) ("[A]n award of the
commission . . . shall be conclusive and binding as to all
questions of fact.").  For the reasons that follow, we find that
the commission correctly concluded that it had jurisdiction over
Paul's claim, although we disagree with the commission's
reasoning.

Jurisdiction over workers' compensation claims in Virginia
is governed by statute.  Code § 65.2-508 requires both that:
"(1) [t]he contract of employment was made in this Commonwealth;
and (2) [t]he employer's place of business is in this

- 6 -

Commonwealth . . . ."  See also 3 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 143.01(2) (2002) (noting that Virginia's statute regarding coverage of out of state injuries is "the narrowest statute of this kind still surviving").  The parties do not dispute that the Redskins' place of business is in Virginia.  Therefore, we must determine whether Paul's "contract of employment was made in this Commonwealth."

Before considering whether Paul's contract of employment was made in Virginia, we must determine what constitutes that contract.  Because the facts surrounding Paul's employment arrangement are not in dispute, "the principal issues raised by this appeal relate not to the factual findings of the commission, but to its application of the law to those findings.  Accordingly, these issues are mixed questions of law and fact[, which we review de novo]."  Roanoke Belt, Inc. v. Mroczkowski, 20 Va. App. 60, 67-68, 455 S.E.2d 267, 270-71 (1995) (citations omitted); cf. Price v. Taylor, 251 Va. 82, 86, 466 S.E.2d 87, 89 (1996) (holding that the validity of a contract is a matter of law).

The deputy commissioner held that the Trade Agreement constituted Paul's contract of employment with the Redskins. The full commission rejected that holding.  On appeal, the Redskins contend that the original contract between the Broncos and Paul, by assignment, became the employment agreement between

- 7 -

the Redskins and Paul. Paul argues that he had an oral contract with the Redskins that became effective when the Director of Player Personnel for the Redskins shook his hand and said, "congratulations, you are now a Redskin." We disagree with each of these contentions and find that Paul's "contract of employment" with the Redskins consisted of the original contract between Paul and the Broncos, the Trade Agreement between the Broncos and the Redskins and, finally, the fulfillment of the conditions precedent to his employment with the assignee team, viz., that Paul report to Redskins Park, pass the team's physical, and play on the Redskins team. See Commercial Contractors, Inc. v. U.S. Fidelity & Guar., 524 F.2d 944, 950 (5th Cir. 1975) (holding that several writings connected by internal references to each other constituted a single contract where they involved the same subject matter and proved to be part of an entire transaction, even if they were executed on different dates and were not among all of the same parties); Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965) (same); Hampton Rds. Shipping Ass'n v. International Longshoremen's Ass'n, 597 F. Supp. 709, 716 (E.D. Va. 1984), modified on other grounds, 746 F.2d 1015 (4th Cir. 1984) (same); see also Rowland Lumber Co. v. Ross, 100 Va. 275, 277, 40 S.E. 922, 923 (1902) (finding a series of letters constituted a written contract).

The original contract provided that Paul would work for the Broncos and could be assigned to another football club. The Trade Agreement provided that Paul would be assigned to the Redskins. Both specified that he would pass their physical and report for work. Absent the fulfillment of the conditions precedent to his employment with the assignee team, Paul would not be an employee of the Redskins. Smith v. McGregor, 237 Va. 66, 376 S.E.2d 60 (1989) (holding that an agreement is inoperable until all conditions precedent are performed). Hence, the written contracts, together with the execution of the conditions precedent, constitute Paul's "contract of employment," with the Redskins, as the term is used in the workers' compensation statute. Code § 65.2-508(A).

"The place where the last act necessary to give validity to the contract occurs is the place where the contract was made." United States Steel Corp., Gary Works v. Industrial Comm'n, 510 N.E.2d 452, 455 (Ill. 1987); accord Stout v. Home Life Ins. Co., 651 F. Supp. 28, 32 (D. Md. 1986), aff'd, 818 F.2d 29 (4th Cir. 1987); Chesapeake Supply & Equip. Co. v. J.I. Case Co., 700 F. Supp. 1415, 1417 (E.D. Va. 1988); Smith v. McBride & Dehmer Construction, 530 P.2d 1222, 1225 (Kansas 1975). In Smith, for example, the court held that the employment contract was made in Oklahoma because the last act done necessary to consummate the contract of employment was for the employee to report at the job site in Oklahoma. 530 P.2d at 1225.

- 9 -

In this case, the final acts necessary to form the contract of employment between Paul and the Redskins occurred in Virginia.  See McGregor, 237 Va. at 75, 376 S.E.2d at 65.  As a condition precedent to Paul's employment with the Redskins, the Trade Agreement required Paul to report to Redskins Park, complete the Club's physical and be on Washington's roster during the 1999 season.  All of these acts took place in Virginia.  Because the last acts necessary to form the contract of employment between Paul and the Redskins occurred in Virginia, the agreement was "made in this Commonwealth" and the commission had jurisdiction over Paul's out of state injury.  Code § 65.2-508; see Stout, 651 F. Supp. at 32; Chesapeake Supply & Equip. Co., 700 F. Supp. at 1417; United States Steel Corp., Gary Works, 510 N.E.2d at 455; Smith, 530 P.2d at 1225.

### B.  Sufficiency of the Evidence

The Redskins claim the commission erred in holding that Paul sustained a compensable injury because no credible evidence supported its determination.  We disagree.

"On appeal, we view the evidence in the light most favorable to [Paul], the party prevailing before the commission."  Great Eastern Resort Corp. v. Gordon, 31 Va. App. 608, 610, 525 S.E.2d 55, 56 (2000).  "A claimant must prove his case by a preponderance of the evidence."  Bergmann v. L & W Drywall, 222 Va. 30, 32, 278 S.E.2d 801, 802 (1981); see Marketing Profiles, Inc. v. Hill, 17 Va. App. 431, 433, 437

- 10 -

S.E.2d 727, 729 (1993) (en banc). Furthermore, "[d]ecisions of the commission as to questions of fact, if supported by credible evidence, are conclusive and binding on this Court." Allen & Rocks, Inc. v. Briggs, 28 Va. App. 662, 672, 508 S.E.2d 335, 340 (1998). Evidence to the contrary in the record "is of no consequence if there is credible evidence to support the commission's findings." Russell Loungewear v. Gray, 2 Va. App. 90, 95, 341 S.E.2d 824, 826 (1986). The consideration and weight to be given to the evidence, including medical evidence, are within the sound discretion of the commission. See Waynesboro Police v. Coffey, 35 Va. App. 264, 268, 544 S.E.2d 860, 861 (2001); Hungerford Mechanical Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 215 (1991).

Code § 65.2-101 defines a compensable injury as an "injury by accident arising out of and in the course of the employment." "[T]o establish an 'injury by accident,' a claimant must prove (1) that the injury appeared suddenly at a particular time and place and upon a particular occasion, (2) that it was caused by an identifiable incident or sudden precipitating event, and (3) that it resulted in an obvious mechanical or structural change in the human body." Southern Express v. Green, 257 Va. 181, 185, 509 S.E.2d 836, 838-39 (1999). Applying these requirements, the commission found that Paul sustained a compensable injury.

Paul presented sufficient evidence to the commission to support its finding.  First, the accident reports prepared by the Washington Redskins establish that Paul was injured on August 28, 1999, while at work for the Redskins in a game in Pittsburgh.  Second, Dr. Avery's report confirmed that the incident, which occurred during the game on August 28 in Pittsburgh, caused Paul's knee injury.  Furthermore, Paul testified that during the game, he "was shedding a blocker, and [he] was going to make a tackle, and [he] made an abrupt turn, and [his] knee, [he] just felt a burning sensation, a tweaking in it."  Although the Washington Redskins point to contrary evidence in the record, we are bound to discard such evidence on appeal.  Russell Loungewear, 2 Va. App. at 95, 341 S.E.2d at 826.

Finding no error, we affirm the decision of the commission.


Affirmed.