PRESENT: All the Justices

JAMES K. WOOLFORD, TRUSTEE OF THE
WOOLFORD TRUST U/A DTD 13 APRIL 2008, ET AL.

v. Record No. 161095

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
November 22, 2017

VIRGINIA DEPARTMENT OF TAXATION

FROM THE CIRCUIT COURT OF KING WILLIAM COUNTY
B. Elliott Bondurant, Judge

The Tax Department rescinded $4.9 million in land preservation tax credits it had

previously awarded to the Woolfords. The circuit court sustained that decision, reasoning that

the appraiser the Woolfords hired was not a "qualified appraiser" within the intendment of Code

§ 58.1-512(B). For the reasons noted below, we will reverse that determination and will remand

for further proceedings.

BACKGROUND

For more than 160 years, the Woolford family has owned a 450-acre farm in King

William County.[1] In anticipation of applying for a land preservation tax credit provided for in

Code §§ 58.1-512 and 58.1-513, they hired a professional appraiser, Michael J. Simerlein, to

appraise the property. Simerlein has been licensed by the Virginia Real Estate Appraiser Board

as a General Real Estate Appraiser since 1994. On November 25, 2011, Simerlein provided a

detailed appraisal which valued the property at $13.5 million without a land preservation

easement, and at $1,070,000 with a conservation easement – a reduction in value of $12,430,000.

---

[1] The appellants are James K. "Jim," Elizabeth P., William W. "Bill," and Janice B.
Woolford.

According to Simerlein, the value of the land overwhelmingly rested in as yet unmined sand and gravel deposits. At the time, the Woolfords had obtained a special use permit from the County and an active state permit through the Virginia Department of Mines, Minerals and Energy. The permit to mine sand and gravel, however, was limited to five acres and the site was not being actively mined. Simerlein valued "the sand and gravel operations as a going concern," allocating $4,550,000 "to the value of the minerals in the ground," and $8,425,000 for a mine as a "prospective going concern." He placed a value of $525,000 on the remaining 174.7 acres of land. Simerlein expressly assumed that the necessary special use permit for the mining operation could be "reasonably secure[d] . . . within 12 months of the date of this appraisal." He further assumed that the existing permit for a limited sand and gravel mining operation on five acres "can be readily expanded by the Virginia Department of Minerals, Mining & Energy . . . to encompass the proposed upper and lower pit areas."

The Woolfords donated a conservation easement to the Virginia Outdoors Foundation on November 11, 2011, and recorded the deed of gift with the King William County Circuit Court. The Virginia Outdoors Foundation is a public conservation agency. *See* Code § 10.1-1800. The easement, which encumbers the entire property, prohibits the Woolfords from mining the sand and gravel on the property.

The Woolfords then applied for land preservation tax credits. By letter dated January 10, 2012, the Department of Taxation awarded the Woolfords a tax credit in the amount of $4,972,000, based on Simerlein's assessment. The letter from the Department stated that

> The amount of tax credit is based solely on the information
> supplied with your Form LPC notification. Any value of the
> donation on which the credit is claimed is subject to review, audit,
> and challenge by all appropriate tax authorities. The Virginia
> Department of Taxation makes no express or implied warranties
> regarding whether any tax benefits will be available to the Grantor

2

> or anyone to whom the credit is transferred. The Department will notify you further only if any portion of your credit is disallowed or otherwise adjusted by the Department. Such notification may be issued either before or after you file an income tax return claiming the credit, subject to the statute of limitations.

The Woolfords later transferred the tax credits to 168 transferees and paid the Department $248,600 in fees for administering the transfers. *See* Code § 58.1-513(C)(1).

On December 3, 2013, the Department notified the Woolfords that there were "material deficiencies and/or issues that cause [the submitted Appraisal] to be unreliable." The Woolfords met with Department officials and submitted a second appraisal. This revised appraisal lowered the appraised value of the conservation easement from $12,430,000 to $10,180,000. The parties were unable to reach a resolution. By letter dated December 4, 2014, the Department stated that it was rejecting the Woolfords' appraisals and disallowing all tax credits. In rejecting the appraisals, the Department cited "the speculative analysis, conflicting data, lack of qualifications, and failure to meet the requirements" of the Code.

The Woolfords appealed the Department's decision to the circuit court. *See* Code § 58.1-1825(D). The Department moved for summary judgment arguing, among other things, that Simerlein was not a qualified appraiser under Virginia law and, accordingly, the entire appraisal should be disregarded.

At a hearing, the court heard extensive testimony concerning Simerlein's qualifications. In addition to being licensed by Virginia as a real estate appraiser, Simerlein holds a master's degree in real estate appraisal and investment analysis from the University of Wisconsin-Madison. He has appraised commercial and residential properties since 1992, and has appraised approximately 100 conservation easement donations. He acknowledged that he has not taken any coursework on the subject of mineral appraisals.

3

As of 2011, Simerlein testified that he either appraised himself or participated in the review of four properties involving sand and gravel mines. In the year 2000, he appraised a tract located in Isle of Wight County, the Turner Estate property. This property involved a proposed plant on 40 acres with 180 acres of residential land tied to it. This appraisal afforded him a first opportunity "to get up to speed on that market." Another appraisal, in James City County in 2005, involved condemning 40 acres adjacent to an operating pit. He concluded that the sand and gravel mine was not the highest and best use for the property. In 2007, he, along with an associate, conducted a review of an appraisal for a property in Charles City County, the Sturgeon Point Tract, involving 103 acres and approximately 3 million tons of material. Finally, in 2011, he and an associate appraised a property in Middlesex County, where a contractor was mining materials for his own construction business.

Simerlein explained that "valuation is a process by which you go from identifying the problem to inspecting the property to studying the market and ultimately preparing market analysis" for the property's highest and best use. He reviewed his previous sand and gravel appraisal work, as well as published appraisal industry resources. He testified that he educated himself concerning the sand and gravel market for King William County. He discussed the matter with "friends in the industry," spoke with other appraisers, researched production statistics, and felt comfortable making an appraisal. In addition to his previous appraisals, Simerlein did "quite a bit of local research." He studied the local market for sand and gravel, including all the other large active competitive pits in King William, examined the infrastructure near the Woodfords' property, talked to other local market participants, looked for sales of comparable mines, and spoke with local sources as well as officials at the Department of Mines,

4

Minerals and Energy. He relied on the report by a licensed geologist that the site contained 7.75 million tons of marketable sand and gravel.

At the conclusion of the hearing, the court stated from the bench that Simerlein acknowledged he was not formally educated in appraising minerals. The court also discounted the four prior appraisals on the basis that they were different: one was for a depleted mine, one was for sand and fill dirt, which differs from sand and gravel, one was a review of an appraisal, and the other was one that he co-signed. The court granted summary judgment for the Department, holding that "the Plaintiffs' appraiser lacks the necessary education and experience, as required by applicable federal law incorporated by . . . . Code § 58.1-512.B, to offer an appraisal of mineral property."

## ANALYSIS

The General Assembly enacted the Land Conservation Incentive Act of 1999 "to supplement existing land conservation programs to further encourage the preservation and sustainability of Virginia's unique natural resources, wildlife habitats, open spaces and forested resources." Code § 58.1-510. The law permits a tax credit for donations of land or an interest in land "for the purpose of agricultural and forestal use, open space, natural resource, and/or biodiversity conservation, or land, agricultural, watershed and/or historic preservation." Code § 58.1-512(A). The donation must be unconditional, and it must be made "to a public or private conservation agency eligible to hold such land and interests therein for conservation or preservation purposes." *Id.* For donations after 2007, taxpayers can claim a 40 percent tax credit "of the fair market value of the land or interest in land so conveyed." *Id.*

I. SIMERLEIN WAS A QUALIFIED APPRAISER.

The governing statute, Code § 58.1-512(B), provides in relevant part that

5

The fair market value of qualified donations made under this section shall be determined in accordance with § 58.1-512.1 and substantiated by a "qualified appraisal" prepared by a "qualified appraiser," as those terms are defined under applicable federal law and regulations governing charitable contributions.

The statute incorporates the federal law definition of "qualified appraiser." In turn, 26 U.S.C. § 170(f)(11)(E)(ii) states:

Except as provided in clause (iii), the term 'qualified appraiser' means an individual who—
(I) has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary,
(II) regularly performs appraisals for which the individual receives compensation, and
(III) meets such other requirements as may be prescribed by the Secretary in regulations or other guidance.

In addition, 26 U.S.C. § 170(f)(11)(E)(iii) specifies that

An individual shall not be treated as a qualified appraiser with respect to any specific appraisal unless—
(I) the individual demonstrates verifiable education and experience in valuing the type of property subject to the appraisal . . . .

Although the IRS has proposed regulations governing "qualified appraisers," those regulations have not been adopted.[2]

To determine whether, on these facts, Simerlein was a "qualified appraiser" under Code § 58.1-512 requires us to construe the language of the statute. "[S]tatutory interpretation is a question of law which we review de novo." *Jones v. Williams*, 280 Va. 635, 638, 701 S.E.2d 405, 406 (2010) (quoting *Syed v. ZH Techs., Inc.*, 280 Va. 58, 69, 694 S.E.2d 625, 631 (2010)).

The Woolfords argue that so long as the appraiser is licensed, he is qualified. We disagree. There are several requirements an appraiser must meet to be qualified. First, under 26

---

[2] Prop. Treas. Reg. § 1.170A-17(b)(1), 73 Fed. Reg. 45,908 (Aug. 7, 2008).

U.S.C. § 170(f)(11)(E)(ii), an appraiser must have "earned an appraisal designation from a recognized professional appraiser organization." Being licensed is a necessary requirement but it is not the only requirement under the statute. Additionally, an appraiser must "demonstrate[] verifiable education and experience in valuing the type of property subject to the appraisal." 26 U.S.C. § 170(f)(11)(E)(iii)(I).

We also reject the Woolfords' argument that "the type of property subject to the appraisal," 26 U.S.C. § 170(f)(11)(E)(iii)(I), simply refers to real property. In other words, under the Woolfords construction, "type of property" does not refer to a farm, a shopping mall, or some specific type of real property, it simply means real property, as opposed to personal property. Real property comes in a wide range of uses: farms, commercial property, manufacturing facilities, urban and suburban residences, and so on. An appraiser who specializes in one particular type of real property may not be in a position to make a knowledgeable appraisal of a completely different kind of property. The point of Code § 58.1-512 as well as 26 U.S.C. § 170(f) is not to invite guesswork or incompetence but to obtain an appraisal by someone who possesses sufficient knowledge and experience to make an informed appraisal of the property in question. In this instance, the property was an active farm with open land and significant sand and gravel deposits. Therefore, a qualified appraiser needed "verifiable education and experience in valuing" this kind of property. The property need not be identical, however, to properties appraised in the past. It is sufficient if the appraiser can, from education and/or experience, make an informed and accurate appraisal of the property.

The Woolfords also cite to a 2006 IRS Notice, which provides that

> An appraiser will be treated as having met the minimum education and experience requirements [of federal law] if . . . [f]or real property . . . the appraiser is licensed . . . for the type of property

7

> being appraised in the state in which the appraised real property is
> located.

IRS Notice 2006-96, 2006-2 C.B. 902, 2006 IRB LEXIS 596, at *6 (Oct. 19, 2006). Since there is no Virginia licensing subspecialty for appraising real estate, the Woolfords argue, under this guidance, Simerlein's general license to appraise real property means that he is a qualified appraiser. We do not consider this guidance either binding or persuasive. Such guidance does "not carry the force of law." *Tax Analysts v. IRS*, 416 F. Supp. 2d 119, 126 (D. D.C. 2006). The notice itself purports to provide "transitional guidance." IRS Notice 2006-96, 2006 IRB LEXIS 596, at *1. Moreover, Code § 58.1-512(B) incorporates into Virginia law "federal law and regulations," not guidance. Finally, given the complexity of appraising different kinds of real estate, we do not believe that either the General Assembly or Congress intended to allow a person with a total lack of education or experience in appraising a particular "type of property" to submit a "qualified appraisal" simply by virtue of holding a general real estate appraisal license.[3]

One way an appraiser can be qualified is if he possesses "verifiable education" about a type of property. 26 U.S.C. § 170(f)(11)(E)(iii)(I). Simerlein acknowledged he did not take any formal coursework on appraising land with mineral deposits generally or sand and gravel more specifically. Assuming "verifiable education" under 26 U.S.C. § 170(f)(11)(E)(iii)(I) equates to formal classroom education, Simerlein was nevertheless qualified by virtue of his experience in evaluating properties that contained sand and gravel deposits. The trial court discounted that experience, but any weaknesses in his experience did not mean that he was altogether

---

[3] In crafting an appraisal, the appraiser can rely on outside expertise for matters that fall outside of an appraiser's expertise. For example, there was nothing amiss with Simerlein's reliance on geologists to assess the amount and quality of minerals on the Woolfords' land.

unqualified under Code § 58.1-512(B). First, there is no dispute that Simerlein was involved in a number of prior appraisals where sand and gravel mines or comparable mineral deposits were at issue. For example, even if he co-signed a prior appraisal and was not its chief author, the fact remains that he gained experience in that instance in appraising property with a sand and gravel mine. Similarly, even if he concluded that a sand and gravel mine was not the highest and best use of one of the properties he appraised, he again would have learned from the experience. The fact that Simerlein spoke with colleagues and other relevant professionals in the industry in crafting his appraisal is also relevant. The record unequivocally shows that Simerlein expended considerable effort in learning about sand and gravel mines in general and about the local and regional market for those products in particular.

Our review of Simerlein's detailed appraisal report, correspondence, and extensive testimony convinces us that he was a "qualified appraiser" under Code § 58.1-512(B) and could appraise the Woolfords' type of property. Therefore, we conclude that the trial court erred in holding that Simerlein was not a "qualified appraiser."

II. THE DEPARTMENT CAN AUDIT AN APPRAISAL AFTER THE FACT EVEN IF THE APPRAISAL IS NOT FALSE OR FRAUDULENT.

The Woolfords claim that once Simerlein is established as a qualified appraiser, the case is over and the Department must now accept his appraisal and its valuation. In support of this argument, the Woolfords point to Code § 58.1-512(D)(4)(a), which specifies that

> If within 30 days after an application for credits has been filed the Tax Commissioner provides written notice to the donor that he has determined that the preparation of a second qualified appraisal is warranted, the application shall not be deemed complete until the fair market value of the donation has been finally determined by the Tax Commissioner.

9

According to the Woolfords, if the Tax Commissioner does not ask for a second appraisal within 30 days after an application is filed, he is forever barred from challenging the appraisal. This provision of Code § 58.1-512(D)(4)(a), however, deals with the Commissioner's *initial acceptance* of an application for tax credits, not the Commissioner's authority to later audit the value of the tax credits. This provision of the statute does not by its plain terms or by implication foreclose a subsequent audit by the Commissioner of the appraisal or of the claimed value of the tax credit.

The Woolfords also rely on Code § 58.1-512(B), which provides in relevant part that "[a]ny appraisal that, upon audit by the Department, is determined to be false or fraudulent, may be disregarded by the Department in determining the fair market value of the property and the amount of tax credit to be allowed under this section." The Woolfords extrapolate from this statutory language that the only basis upon which the Department can challenge an appraisal is if it is false or fraudulent. Because Simerlein's appraisal is neither false nor fraudulent, they reason, the Department must accept his appraisal figures. We do not agree.

First, by its plain text, Code § 58.1-512(B) does not limit the scope of a Department audit. It simply authorizes the Department to disregard a false or fraudulent appraisal as it seeks to determine the fair market value, and therefore the tax credits due, for a particular property. The import of this sentence is that the Department's initial acceptance of an appraisal does not mean that it is foreclosed from later disregarding the appraisal altogether if it is false or fraudulent. Second, we can perceive no reason why the General Assembly would wish, uniquely in this area, to hamstring audits by the Department by artificially limiting them to the question of whether the appraisal is false or fraudulent. In fact, Code § 58.1-512(D)(6), which addresses audits, provides without restriction that:

10

> Neither the verification of conservation value by the Department of Conservation and Recreation nor the issuance of a credit by the Department of Taxation shall in any way be construed or interpreted as prohibiting the Department of Taxation or the Tax Commissioner from auditing any credit claimed pursuant to the provisions of this article or from assessing tax relating to the claiming of any credit under this article.

If the Department concludes that an appraisal is flawed in some way – but not false or fraudulent – the Department can rely on those portions of the appraisal that are reliable as it strives to ensure that the credits claimed are in fact based on "[t]he fair market value of [the] qualified donation[]." Code § 58.1-512(B).

For all these reasons, the Department was not constrained from auditing the value of the tax credits claimed by the Woolfords after initially awarding them those tax credits.

III.    WE WILL REMAND FOR FURTHER PROCEEDINGS.

The trial court's ruling on Simerlein's qualifications precluded it from reaching a number of arguments with respect to the value placed on the easement. Among other things, the Department argued below that an existing permit for a five-acre mine, on which no mining is actually occurring—in the words of the appraisal, a "prospective" going concern—does not constitute an interest in land for which a party may claim a tax credit under Code § 58.1-512, and even if it does, the total amount of the tax credit is only the 25 percent allowed for improvements under Code § 58.1-512.1(B), rather than the 40 percent tax credit allowed under Code § 58.1-512(A). The Department also argued that Code § 58.1-512.1(C) requires a donation to be "consistent with existing zoning requirements" and that the need for the expansion of the Woolfords' existing special use permit under County zoning law means that it does not satisfy this condition. In addition, the Department contended that Simerlein's appraisal was flawed with

11

respect to the market demand for aggregate.  The Woolfords, of course, contest these arguments.

Accordingly, we will remand this case for resolution of all remaining issues.[4]

We finally note the Department's striking position that the Woolfords are entitled to

nothing for their donation to the Commonwealth.  The tax credits that the General Assembly has

authorized must be based on "[t]he fair market value of qualified donations."  Code §

58.1-512(B).  The object of auditing the claimed credits is to enable the Department to

"determine[] the fair market value of the property and the amount of tax credit to be allowed

under this section."  Code § 58.1-512(B).  Even if the Department were to prevail below on its

remaining arguments, a point on which we express no opinion, unless the Department concludes

in good faith based on the evidence that the value of the easement is zero, it must award the

Woolfords tax credits for the fair market value of the donation.[5]

---

[4] The Department did not assign cross-error to the trial court's refusal to address a number of arguments it made in its motion for summary judgment.  We have previously held that an appellee must assign cross-error to a lower tribunal's failure to rule on alternative grounds to preserve the issue for appellate review.  *See Horner v. Dep't of Mental Health*, 268 Va. 187, 194, 597 S.E.2d 202, 206 (2004) ("The Court of Appeals did not rule in favor of the Department on the issue of the circuit court's lack of jurisdiction.  In order to preserve that issue for our review, an assignment of cross-error citing the Court of Appeals' failure to so rule was necessary.").  *See also Virginia Marine Res. Comm'n v. Clark*, 281 Va. 679, 688, 709 Va. 150, 156 (2011) (applying *Horner*).  Those holdings are incompatible with our current approach, which requires an assignment of cross-error (or a cross-appeal) "only when an appellee seeks to modify or otherwise change a favorable judgment 'with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'"  *Alexandria Redevelopment & Hous. Auth. v. Walker*, 290 Va. 150, 156, 772 S.E.2d 297, 299-300 (2015) (quoting *Jennings v. Stephens*, 135 S. Ct. 793, 798 (2015)).  Our holdings in *Horner* and *Clark* on the requirement of assigning cross-error in a failure to rule situation are hereby expressly overruled.

[5] We also note the Department's concession that if its remaining arguments are found to be without legal merit, the Woolfords will receive "their credits in the amount that they claimed."

CONCLUSION

We will reverse the trial court's determination that Simerlein was not a "qualified appraiser" of the Woolford's property and we will remand for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*