COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Petty and AtLee
Argued at Lexington, Virginia

UNPUBLISHED

PITTSYLVANIA COUNTY
  BOARD OF SUPERVISORS AND
  NORTH RIVER INSURANCE COMPANY

                                             MEMORANDUM OPINION* BY
v.      Record No. 1869-17-3                 JUDGE RICHARD Y. ATLEE, JR.
                                                    JUNE 12, 2018
JANNA HALL

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

         Andrew H.D. Wilson (Two Rivers Law Group, P.C., on brief), for
         appellants.

         Darren Shoen (Law Office of Darren Shoen, PLLC, on brief), for
         appellee.


         The Pittsylvania County Board of Supervisors and North River Insurance Company

(collectively, "employer") appeal a decision of the Commission in favor of claimant Janna Hall

("Hall").  We find no error and affirm the Commission's decision.

                                    I.  BACKGROUND

         On appeal of Commission decisions, we view the facts in the light most favorable to the

party that prevailed before the Commission, in this case Hall.  Hess v. Va. State Police, 68

Va. App. 190, 194, 806 S.E.2d 413, 415 (2017).  In 1978, Hall fell down several stairs at work,

injuring her right knee.  She was twenty years old at the time.  Hall and employer endorsed a

"Memorandum of Agreement as to Payment of Compensation" in 1979, describing the injury as

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

a "[c]ontusion and hemarthrosis of [the] right knee.[1]" Later that year, the Commission approved the parties' agreement and entered an award. The final sentence of that 1979 award stated: "Medical benefits are awarded for as long as necessary."[2]

In 1980, rheumatologist Vincent Giuliano examined Hall, and reviewed her medical records. He wrote that Hall had "a 2 year history of a chronic inflammatory arthritis[3] of both knees." He concluded:

> Hall claims that she was well prior to the fall and since that time she has had arthritis in 2 knees and 1 elbow, all of which appear to have been traumatized at that time. If her story is accurate, and I have no reason to think otherwise, then clearly her arthritis is temporally related to her fall.

Dr. Giuliano also wrote that "laboratory data in November, 1979 . . . showed . . . a negative test for rheumatoid factor."

In 1985, orthopedic surgeon Paul Fitzgerald described Hall in a written report: "This is a 26 year old female with bilateral knee involvement secondary to inflammatory arthritis, most likely rheumatoid type, who underwent a left total knee replacement. . . . FINAL DIAGNOSIS: Rheumatoid arthritis[4] - inflammatory."[5] In a 2006 letter to another doctor, Dr. Fitzgerald

---

[1] One of Hall's doctors later explained that this means that Hall "bled into the knee[]."

[2] This award also granted Hall certain periods of disability compensation, and later supplemental awards granted additional periods of disability compensation. Hall was no longer receiving any disability compensation by the time the proceedings giving rise to this appeal occurred. This appeal concerns only medical benefits.

[3] "Arthritis" is "inflammation of joints." Dorland's Illustrated Medical Dictionary 151 (29th ed. 2000).

[4] "Rheumatoid arthritis" is a specific type of arthritis, "a chronic systemic disease primarily of the joints" whose "cause is unknown," though "autoimmune mechanisms and virus infection have been postulated." Id.

[5] Dr. Fitzgerald confirmed that Hall's rheumatoid arthritis was due to the knee injury that occurred when she fell at work. "Attending Physician's Report" (Jan. 20, 1984). Although this report is not included in the appendix, it is part of the record transmitted to this Court. Per Rule

described Hall as "a longtime patient of mine with rheumatoid arthritis and multiple joint replacements."

Between 1979 and approximately 2010, rheumatologist Jeffrey Wilson treated Hall. In 1998, Dr. Wilson wrote of Hall: "The patient certainly remains completely disabled from her chronic long standing inflammatory spondyloarthropathy.[6]" In 2008, Dr. Wilson opined that Hall "continued to have active inflammatory arthritis resulting from her fall as before." In a 2010 letter to employer, Dr. Wilson wrote that "Hall has been followed in our office for over 30 years with problems of inflammatory polyarthritis[7] which has been grossly deforming, requiring multiple joint replacements, and followed a traumatic injury and fall." During the time Dr. Wilson treated Hall, he prescribed various medications to treat her arthritis, and to alleviate the associated pain. Hall also underwent several surgeries in connection with her joints, including knee and hip replacements. Around 2010, Dr. Wilson retired. Hall's longtime primary care doctor, Michael Will, took over the management of the medication previously prescribed by Dr. Wilson.

At his deposition, Dr. Will stated that Hall had "been termed to have post-traumatic arthritis in multiple joints since" her work injury occurred. As a result of her accident, Dr. Will stated, Hall has experienced "chronic pain, particularly about her neck and about her lumbar spine," as well as "in her hips and knees, hands and feet and ankles." When presented with a report from one of the rheumatologists hired by employer (who believed that Hall actually suffered from rheumatoid arthritis unrelated to the work injury), Dr. Wilson stated:

---

5A:25(h), we may consider documents included in the record but left out of the appendix. See Cabral v. Cabral, 62 Va. App. 600, 604 n.1, 751 S.E.2d 4, 7 n.1 (2013).

[6] "Spondyloarthropathy" is "disease of the joints of the spine." Dorland's, supra, at 1684.

[7] "Polyarthritis" is "an inflammation of several joints together." Id. at 1428.

> Rheumatoid arthritis, you know, can be diagnosed at times by particular markers. To my knowledge, she didn't have those. You know, Dr. Wilson was the one that treated her, but he termed her a post-traumatic arthritis. His impression, it was my understanding from reading his records, was that he thought it did occur as a result of her injury, the accident.

He continued, stating "to the best of my knowledge, her arthritis problems started after she had the fall."

In March 2016, Hall received a letter from employer notifying her that, "[b]ased upon medical peer review, please be advised that effective 04/15/2016 medications being prescribed by Dr. Will will no longer be covered under the workers['] compensation claim of 09/05/1978." In June 2016, Hall wrote to the Commission, enclosing employer's letter. Hall asked the Commission for "help in resolving this matter." The Commission treated Hall's letter as a claim for medical benefits, and eventually a deputy commissioner heard the matter.[8]

By letter to the deputy commissioner dated November 17, 2016, employer "move[d] the Commission to appoint a disinterested and duly qualified physician or surgeon to make a medical examination and to testify in respect thereto, pursuant to Va. Code § 65.2-606." The deputy commissioner denied this motion, with this explanation:

> I will also indicate why I'm denying the motion to request for disinterested position [sic], even though the Act allows us to do it. I don't think it's proper for the [C]ommission [to] order a physician. I think that is almost a form of micromanagement by

---

[8] Initially, the Commission treated Hall's letter as a change in condition claim. See Letter from the Commission, styled a "Notice of Referral to Alternative Dispute" [sic] (June 6, 2016) ("On June 3, 2016, the Injured Worker filed the attached change in condition claim with regard to this injury."). But the opinions of the deputy commissioner and full Commission make clear that the letter was ultimately handled as a claim for medical benefits. See Deputy Commissioner's Opinion (Apr. 11, 2017) (explaining that the matter was "before the Commission upon the claimant's claims . . . in regard to a right knee injury" and that claimant "sought payment of prescriptions"); Full Commission's Opinion (Oct. 23, 2017) (explaining that "[t]he claimant filed claims . . . request[ing] payment of prescriptions"). Employer does not dispute the posture of this case, or that Hall's letter constituted a claim for medical benefits. See Brief of employer at 1 (observing that "Hall filed claims seeking ongoing medical benefits, including the payment of prescriptions").

the [C]ommission and I'm not fond of doing that. I certainly think that is something the parties should work out between themselves. They can obviously do independent medical examinations.

Employer filed an interlocutory appeal of this denial to the full Commission. The full Commission found "no basis for interlocutory review of the denial of [employer's] motion" and thus "decline[d] interlocutory review" and "returned [the matter] to the Deputy Commissioner's hearing docket."

At the hearing in front of the deputy commissioner, employer offered the written opinions of three rheumatologists. All three doctors had conducted record reviews on behalf of employer; none had ever examined or treated Hall. Dr. Blank opined that "the claimant did not have 'traumatic polyarthritis' but rather had an inflammatory autoimmune polyarthritis unrelated to the work comp injury from the beginning." Dr. Bello concluded that "the claimant has rheumatoid arthritis. . . . This is not related to the 9/5/78 injury." Thus, he wrote, "[n]one of the claimant's medications are causally related to the original workers' compensation injury." Finally, Dr. Patel stated:

> In my opinion, the bilateral knee surgeries and continued knee issues are not related to the work compensation injury that was sustained in September of 1978. I do not believe that there is any direct permanent or long-term damage from the worker's compensation injury. The Rheumatoid Arthritis or Spondyloarthropathy are unrelated to the patient's fall in 1978.

Dr. Patel acknowledged that Hall "did not have blood tests that would indicate rheumatoid arthritis" but pointed out that "there are 15-20% of patient[s] with rheumatoid arthritis who do not have positive lab markers."

After hearing the evidence, the deputy commissioner entered a medical award in Hall's favor, and ruled that "medical benefits are continued for as long as necessary for reasonable, necessary and authorized treatment causally related to the claimant's September 05, 1978 injury and in particular, for payment of Celebrex, OxyContin, Pepcid and Vitamin D prescriptions."

The deputy commissioner denied employer's renewed motion for a medical examination pursuant to Code § 65.2-606. Employer appealed these rulings to the full Commission, which affirmed the deputy commissioner. Employer then noted its appeal to this Court.

## II. ANALYSIS

Employer assigns the following errors:

1. The Commission was plainly wrong and erred in making its findings without supporting credible evidence and erred in fundamentally misconceiving the significance of the evidence when it found that [Hall]'s medications were prescribed for injuries causally related to the accident and awarded [Hall]'s claim for continuing prescription medication benefits.

2. The Commission erred in relying on and misinterpreting the opinions and/or medical evidence of Drs. Will and Wilson and a November 4, 1980 letter from Dr. Guliano [sic], failing to consider and weigh the opinion of Dr. Fitzgerald, and discounting the opinions of Drs. Blank, Bello, and Patel in making its findings that [Hall]'s medications were prescribed for injuries causally related to the workplace accident and awarding continuing prescription medication benefits.

3. The Commission erred in denying [employer]'s request for appointment of a disinterested physician for a medical examination under Virginia Code § 65.2-606.

We address the first two assignments of error together in Part II.A. and the third assignment of error in Part II.B.

## A. Award

Employer asserts that the Commission erred "when it found that [Hall]'s medications were prescribed for injuries causally related to the accident and awarded [Hall]'s claim for continuing prescription medication benefits." In making this error, employer argues, the Commission "misinterpret[ed] the opinions and/or medical evidence of Drs. Will and Wilson and

- 6 -

a November 4, 1980 letter from Dr. Guliano [sic], fail[ed] to consider and weigh the opinion of Dr. Fitzgerald, and discount[ed] the opinions of Drs. Blank, Bello, and Patel."

"[T]he claimant has the burden to prove that the medical attention, for which payment is claimed . . . , was causally related to the industrial accident." Watkins v. Halco Eng'g, Inc., 225 Va. 97, 101, 300 S.E.2d 761, 763 (1983). And "[t]he consideration and weight to be given to the evidence, including medical evidence, are within the sound discretion of the [C]ommission." Pro-Football Inc. v. Paul, 39 Va. App. 1, 10-11, 569 S.E.2d 66, 71 (2002).

Code § 65.2-603(A)(1) states, in part, that "[a]s long as necessary after an accident, the employer shall furnish or cause to be furnished, free of charge to the injured employee, a physician chosen by the injured employee from a panel of at least three physicians selected by the employer and such other necessary medical attention." That code section "should be construed liberally in favor of the claimant, in harmony with the [Virginia Workers' Compensation] Act's humane purpose." Papco Oil Co. v. Farr, 26 Va. App. 66, 74, 492 S.E.2d 858, 861-62 (1997).

The ultimate question of "[w]hether disputed medical treatment is compensable as 'other necessary medical attention' within the definition of Code § 65.2-603 presents a mixed question of law and fact, which this Court reviews de novo." Haftsavar v. All Am. Carpet & Rugs, Inc., 59 Va. App. 593, 599, 721 S.E.2d 804, 807 (2012). But "[q]uestions raised by conflicting medical opinions must be decided by the [C]ommission." Penley v. Island Creek Coal Co., 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989). When the Commission weighs conflicting medical evidence and from that evidence determines the cause of an injury, that determination is a finding of fact to which we defer. See Estep v. Blackwood Fuel Co., 185 Va. 695, 699, 40 S.E.2d 181, 183 (1946).

"Though not necessarily conclusive, 'the opinion of the treating physician is entitled to great weight.'" Berglund Chevrolet, Inc. v. Landrum, 43 Va. App. 742, 753 n.4, 601 S.E.2d 693, 698 n.4 (2004) (quoting H.J. Holz & Son, Inc. v. Dumas-Thayer, 37 Va. App. 645, 655, 561 S.E.2d 6, 11 (2002)). That weight has its limits, and "when it appears . . . that the diagnosis is shaded by doubt, and there is medical expert opinion contrary to the opinion of the attending physician, then the trier of the fact is left free to adopt that view which is most consistent with reason and justice." Bristol Builders Supply Co. v. McReynolds, 157 Va. 468, 471, 162 S.E. 8, 9 (1932).

Dr. Wilson, a rheumatologist, treated Hall for over thirty years. He concluded that her arthritis was a result of the accident she suffered in 1978. Dr. Will, who took over Hall's treatment following Dr. Wilson's retirement, concurred in, and deferred to, Dr. Wilson's diagnosis. Dr. Giuliano, also a rheumatologist, wrote in 1980 (after examining Hall and her medical records) that "her arthritis is temporally related to her fall" and noted Hall's "negative test for rheumatoid factor." By contrast, Hall's orthopedic surgeon Paul Fitzgerald wrote in 1985 that his diagnosis was: "Rheumatoid arthritis – inflammatory," although Dr. Fitzgerald did note that Hall's rheumatoid arthritis was the result of her workplace injury. See supra note 5. All three rheumatologists (Dr. Blank, Dr. Bello, and Dr. Patel) who performed recent reviews of Hall's medical records on behalf of employer (but did not treat or examine her) concluded that Hall's arthritis was unrelated to her 1978 work accident.

The Commission weighed the opinions of seven different doctors, and decided that the medical treatment was compensable. Employer asserts that "the Commission fundamentally misconceive[d] the significance of the evidence." This is simply another way of complaining about how the Commission weighed the conflicting evidence. The Commission was

unconvinced by the evidence presented by employer.[9]  "It is not our function, but the Commission's, to weigh conflicting evidence, and when there is credible evidence to support the Commission's findings, we are bound thereby."  Chandler v. Schmidt Baking Co., 228 Va. 265, 268, 321 S.E.2d 296, 298 (1984).  Applying the law, specifically Code § 65.2-603, to the facts found by the Commission, we decline to disturb the Commission's decision.  Reviewing *de novo* "[w]hether [the] disputed medical treatment [wa]s compensable as 'other necessary medical attention' within the definition of Code § 65.2-603," Haftsavar, 59 Va. App. at 599, 721 S.E.2d at 807, we find that it was.

## B.  Medical Examination

Employer also argues that "[t]he Commission erred in denying [employer]'s request for appointment of a disinterested physician for a medical examination under Virginia Code § 65.2-606."  We review questions of statutory construction *de novo*, Woolford v. Va. Dep't of Tax'n, 294 Va. 377, 386, 806 S.E.2d 398, 402 (2017), and "our 'primary objective,' as always, is 'to ascertain and give effect to legislative intent' from the words of the statute," Turner v. Commonwealth, 295 Va. 104, 108, 809 S.E.2d 679, 681 (2018) (quoting Lawlor v. Commonwealth, 285 Va. 187, 236, 738 S.E.2d 847, 875 (2013)).  We must "give those words 'their ordinary meaning, unless it is apparent that the legislative intent is otherwise.'"  Id. (quoting Phelps v. Commonwealth, 275 Va. 139, 142, 654 S.E.2d 926, 927 (2008) (citations omitted)).  More generally, when interpreting a statute, "the 'plain, obvious, and rational meaning of a statute is to be preferred over any curious, narrow, or strained construction.'"  Id. at

---

[9] Dr. Patel conceded "that the patient did not have blood tests that would indicate rheumatoid arthritis," but pointed out that "there are 15-20% of patient[s] with rheumatoid arthritis who do not have positive lab markers."  Acknowledging this fact, the deputy commissioner stated:  "[T]hat still leaves an 80-85% chance that the claimant did not have positive lab markers *because she does not have rheumatoid arthritis*."  (Emphasis added).

109, 809 S.E.2d at 681 (quoting Meeks v. Commonwealth, 274 Va. 798, 802, 651 S.E.2d 637, 639 (2007)).

Code § 65.2-606 states, in relevant part: "The Commission or any member thereof may, upon the application of either party or upon its own motion, appoint a disinterested and duly qualified physician or surgeon to make any necessary medical examination and to testify in respect thereto . . . ." By implication, employer argues that although the statute says the Commission *may* appoint a disinterested physician to conduct an examination, in situations like employer's, the Commission *must* do so. We cannot countenance that interpretation of the statute.

"Unless it is manifest that the purpose of the legislature was to use the word 'may' in the sense of 'shall' or 'must,' then 'may' should be given its ordinary meaning—permission, importing discretion." Masters v. Hart, 189 Va. 969, 979, 55 S.E.2d 205, 210 (1949); see also Sauder v. Ferguson, 289 Va. 449, 457, 771 S.E.2d 664, 668-69 (2015) ("We will apply the ordinary meaning of the word 'may' in construing a statute unless a contrary legislative intention plainly appears."); Webster's Third New International Dictionary 1396 (2002) (defining "may" as "have permission to"); may, Black's Law Dictionary (10th ed. 2014) (defining "may" as "be permitted to"). But see Chesapeake & Ohio Ry. Co. v. Pulliam, 185 Va. 908, 916, 41 S.E.2d 54, 58 (1947) (observing that although "[t]he word 'may' is *prima facie* permissive, importing discretion, . . . courts construe it to be mandatory when it is necessary to accomplish the manifest purpose of the Legislature").

We see no indication that the legislature intended the word "may" contained in Code § 65.2-606 to be interpreted as "shall" or "must"; therefore, we give the word "may" its ordinary meaning. Ordinarily, "may" is a permissive word. It follows that if the Commission is permitted

to take certain action, the Commission is also permitted *not* to do so.[10]  See also Gale v. Zaban's Mattress & Box Spring Co., 191 Va. 610, 615, 62 S.E.2d 19, 21 (1950) (observing that it was appropriate to "leav[e] the appointment of this physician, for the purpose of the examination, to the discretion of the hearing commissioner, as is contemplated by the statute") (interpreting Code § 65-87, a forerunner of Code § 65.2-606).[11]  The Commission exercised its legislatively-bestowed discretion not to appoint a disinterested physician.  We find no error in that decision.

### III.  CONCLUSION

We find no error in the Commission's decision to award Hall medical benefits.  Further, the Commission did not err when it declined to appoint a disinterested physician pursuant to Code § 65.2-606.

Affirmed.

---

[10] In its brief, employer also argues that the failure to appoint a disinterested physician pursuant to Code § 65.2-606 was error in light of one of the deputy commissioner's comments explaining her denial of employer's motion.  The deputy commissioner stated that one of the reasons she felt it unnecessary to appoint a disinterested physician was because the parties "can also obviously do independent medical examinations."  Employer argues in its brief that "Code § 65.2-607, section A., provides for an employer's medical examination 'so long as [the claimant] claims compensation.'  Here, Hall is not claiming compensation.  Only medical benefits are at issue per Hall's claim for benefits, so [Code] § 65.2-607 precludes" the examination to which the deputy commissioner referred.  (Brief of employer at 25) (first alteration in original).  Because we decide that the word "may" in Code § 65.2-606 permits the Commission to decline to appoint a disinterested physician, we need not address the availability of an examination pursuant to Code § 65.2-607.

[11] Dr. Patel, one of the rheumatologists employer hired, was confident enough in his diagnosis of Hall that he concluded, near the end of his letter:  "An examination is not needed because the review of records is substantial enough to diagnose this patient."